## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REMBRANDT 3D HOLDING LTD,

                Plaintiff,

    v.

TECHNOVATIVE MEDIA, INC, HAWK
INVESTMENT HOLDINGS LTD., and
SEECUBIC, INC.,

                Defendants.

C.A. No. [_____]

**JURY TRIAL DEMANDED**

## COMPLAINT FOR INJUNCTIVE RELIEF
## AND MISAPPROPRIATION OF TRADE SECRETS

Plaintiff Rembrandt 3D Holding Ltd ("R3D"), by and through their counsel and for their

Complaint against Technovative Media, Inc. ("Technovative"), Hawk Investment Holdings Ltd.

("Hawk") and SeeCubic, Inc. ("SeeCubic") hereby alleges as follows:

### PARTIES

1.      Plaintiff is a corporation organized and existing under the laws of the Island of

Nevis with a registered address at Suites 5&6 Horsfords Business Centre, Long Point Road,

Nevis, West Indies.  Plaintiff is the owner of all of the assets of 3D Fusion Corp. ("3D Fusion"),

a Delaware corporation formed on March 26, 2007 with its principal office at 110 Wall Street in

New York City and its wholly owned Dutch subsidiaries 3D Fusion Holding B.V. ("3D Fusion

Holding") and 3D Fusion EU B.V. ("3D Fusion EU") in Eindhoven, Netherlands.

2.      Defendant Technovative is a Delaware corporation that is wholly owned by

Stream TV Networks Inc., and upon information and belief became Stream's technology asset

and I.P. depository.  Stream TV Networks Inc. ("Stream") is also a Delaware corporation and has

its principal offices at 2009 Chestnut Street, Philadelphia, PA 19103.  Upon information and

belief Mathu Rajan is the C.E.O. of Stream and his brother Raja Rajan is the C.O.O. and together they have held the majority voting control of Stream since its formation in 2010.

3.      Stream and the Rajans were defendants in litigation brought by the Plaintiff in the Southern District of New York.  (Ex. 1.)  The litigation resolved through a settlement agreement that licensed R3D's intellectual property to Stream (Ex. 2) which included the trade secrets, patent, and trademarks owned by R3D.  The trade secrets licensed to Stream in the license agreement.  (Ex. 2.)

4.      The trade secrets licensed by R3D to Stream are embedded in the technology Stream included in its products and are known to the engineers that used to work with 3DFusion, then Stream, and now SeeCubic.

5.      Upon information and belief, Technovative has access to R3D intellectual property that was licensed to Stream.  Technovative would only have rights to manufacture and/or distribute the Steam product for benefit of Stream and R3D only pursuant to the license agreement between Stream and R3D.  (Ex. 2.)  The 3D no glasses technology is owned by R3D and is the intellectual property subject matter of this Complaint, to which Technovative has no right to transfer or to use outside of Stream's control.

6.      Defendant Hawk is a corporation in the United Kingdom with offices at Newport House, 15 The Grange Street, Peter Port, Guernsey.  Per Hawk's own filings in the Delaware Court of Chancery, Hawk is an investor in Stream and is seeking to take control of Technovative. (No. 2022-0930-JTL – Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et al.)

7.      Defendant SeeCubic is a Delaware corporation with offices at 667 Madison Avenue, New York, NY, United States, 10055.  Per SeeCubic's own filings in the Delaware Court of Chancery, SeeCubic is in control of an investment originally made by SLS Holdings VI,

LLC in Stream and has both threatened to misappropriate Plaintiff's trade secrets and has actually misappropriated Plaintiff's technology.  (No. 2020-0766-JTL – In Re Stream TV Networks, Inc. Omnibus Agreement Litigation.)  For a review of the previous Delaware Omnibus litigation please see Vice Chancellor Laster's opinion "Factual Background."  (Exhibit 3.)

<u>**JURISDICTION AND VENUE**</u>

8.     This Court has jurisdiction based on diversity pursuant to 28 U.S.C. 1332 whereas plaintiff is a Nevis corporation, Technovative and SeeCubic are Delaware corporations and Hawk is a UK corporation and damages exceed $75,000.

9.     This Court has personal jurisdiction over Technovative and SeeCubic as both corporations are incorporated in Delaware.

10.     The Court has personal jurisdiction over Hawk as it has appeared in Delaware state court and availed itself of Delaware law to effectuate the misappropriation of R3D's trade secrets in violation of Delaware Code Title 6, Subtitle ll, Chapter 20, which states that "actual or threatened misappropriate may be enjoined[]" and further alleged in greater detail below.

<u>**INTRODUCTION**</u>

11.     R3D is the owner and developer of multiple patents and trade secrets which comprise the 3D no glasses technology discovered by its C.E.O. Mr. Stephen Blumenthal. Blumenthal's discoveries came while working with his licensed Royal Philips WOWvx 3D hardware and software tools in the design of his 3D Auto Stereoscopic Display (3DASD) LCD technology platform.

12.     Stream came to R3D's predecessor, 3DFusion, as an investor in 2010 and the relationship became adversarial when R3D filed suit against Stream in the Southern District of

New York Court in 2017.  After four years of litigation, R3D's lawsuit against Stream was resolved in their signing a May 23, 2021 Settlement Agreement (Ex. 2).

13.    Stream developed a WOWvx, 2D Plus Depth 3D, no glasses LCD 3DTV based on licensing rights from both the Royal Philips company of the Netherlands and Rembrandt 3D Holding Ltd.  It is the R3D trade secret technology licensed to Stream and branded as the Ultra-D 3DTV, that Hawk and SeeCubic are attempting to misappropriate and to own through the current Chancery litigation against Stream and Technovative.

14.    The R3D trade secrets range from the repurposing of Philips' software tools resulting in massive 3D image correction and optimization opportunities, to the utilization of a Philips optical lens array in a manner not envisioned by Philips and consequently when coupled with other trade secret improvements to the Philips WOWvx 3DASD platform, new heights in operational and performance standards are achieved.

15.    Hawk and Stream are presently engaged in litigation in the Delaware Court of Chancery, (No. 2022-0930-JTL – Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et al.) in Hawk's effort to gain control of Technovative.  Hawk has publicly stated that if it gains control of Technovative and R3D's 3D trade secret property, Hawk intends to sell the intellectual property held by Technovative which includes the R3D trade secrets.  (Ex. 4 at ¶¶ 22, 86, The Hawk Complaint) ("Thereafter, Hawk may 'sell, lease or otherwise dispose of the Collateral in whole or in part, at public or private sale, on or off the premises of [Stream],' including pursuant to an Article 9 Sale.".)

16.    Indeed, by Hawk's own admission in its court filings, Hawk has already begun the process of seeking sale of R3D's trade secrets and products that when used would be covered by R3D patents:

On October 10, 2022, Hawk formally engaged SSG Advisors, LLC ("SSG")  to act
as investment banker in connection with the Article 9 Sale. SSG commenced
an analysis of Stream's business and affairs related to the Collateral from publicly
available information or other information in Hawk's possession as a result of its
past relationships with Stream.

(Ex. 4 at ¶ 55.)

17.     Thus it appears that the primary purpose of the Hawk Complaint is to facilitate the

court's support for the transfer and sale of the Technovative assets, particularly those related to

3D no-glasses intellectual property.  However, upon information and belief, the only such

intellectual property owned by Technovative comes from its relationship with Stream, and the

intellectual property provided to Stream under its license with R3D.

18.     Stream licensed the R3D patents and trade secrets because as WOWvx

foundational discoveries their application was central to Stream's Ultra-D 3DTV's key 3D image

quality corrections, and optimizations.

19.     Both SeeCubic and Hawk had prior knowledge of the trade secret being

misappropriated.

20.     SeeCubic's C.E.O., Mr. Shadron Stastney, was active and the representative for

Stream in the settlement negotiations on April 12, 2019 and he signed the R3D Stream April 12,

2019 Settlement Term Sheet Agreement between Stream and R3D (Ex. 5).  The R3D Stream

April 12, 2019 Settlement Term Sheet Agreement included the list of R3D's trade secrets and

Mr. Stastney was fully aware of R3D's ownership of the trade secrets.  The former Stream

C.F.O., Shadron Stastney, formed SeeCubic and acquired rights of the former investors and

creditors of Stream.  SeeCubic sought to gain control of Stream's assets and an Omnibus

Agreement was executed that purported to transfer Stream's assets to SeeCubic, but litigation

was commenced in the Delaware Chancery Court and the Omnibus Agreement was later held to

be invalid (No. 2020-0766-JTL – In Re Stream TV Networks, Inc. Omnibus Agreement Litigation).

21.     Upon information and belief, Technovative as the wholly owned subsidiary of Stream and had and has access to R3D intellectual property that was licensed to Stream.  The R3D license granted to Stream states: "Either Party may sub-license their rights to other parties for the purpose of having products distributed by the Party." but no other sub-licensing is permitted.  (*See* Ex. 2 at ¶ 14.)

22.     Hawk does not have an assignment of the license (Ex. 2) indirectly or directly from R3D.  It is not entitled to transfer, convey, sell, dispose, or use the R3D technology without a license.  As a wholly owned subsidiary of Stream, Technovative would have a right to supply/distribute product for the benefit of Stream or R3D, under the terms of the license granted to Stream by R3D.  (*See* Ex. 2 at ¶ 14.)  However, Technovative has no rights to the technology independent of Stream and cannot sublicense the technology to Hawk or SeeCubic, nor would it have any right to use the technology for the benefit of any party other than R3D or Stream without authorization from R3D.

23.     Since Hawk has publicly stated that it seeks to take control of Technovative and sell R3D's assets (i.e., R3D's patents and trade secrets), R3D seeks to enjoin Technovative from transferring, conveying, selling, disposing or utilizing the technology to any party that does not have a license (including Hawk or any Hawk designee) and to further enjoin Hawk from selling, transferring, conveying, disposing or utilizing the technology without a license.

24.     SeeCubic C.E.O. Stastney stated, "Since the Court entered the Order Granting Preliminary Injunction on December 8, 2020, SeeCubic has raised and deployed in excess of $10 million in order to further develop the glasses-free 3-D technology first started by Stream."

However, "the glasses-free 3-D technology first started by Stream" included R3D's technology and was retroactively licensed to Stream through the settlement agreement.  (Ex. 2).

25.     SeeCubic has also demonstrated R3D's technology at trade shows, representing that R3D's technology is its own.  (*See* Exs. 4 & 5.)  Further, SeeCubic provided a TV incorporating Plaintiff's patents and trade secrets to multiple entities, including one in Dubai, (Ex. 6) and upon information and belief, to an entity in Korea.

26.     SeeCubic has misrepresented and falsely stated that it ***owns*** and had the rights to R3D's intellectual property.  Moreover, Plaintiff alleges that SeeCubic had been on notice since SeeCubic's Chief Executive Officer, Shadron L. Stastney, was Stream's previous Chief Financial Officer and Director and had signed the April 12, 2019 Settlement Agreement with R3D.  It was in that capacity as Stream's Director and CFO that Mr. Stastney was authorized to represent Stream during the Southern District of New York's mediation proceedings ordered by Judge Abrams and instituted because of Stream's breach of its contractual obligations to 3DFusion (and as successor in interest, R3D) related to the 3D trade secret technology.

During those proceedings, Mr. Stastney had personal knowledge and played a key role in the negotiations and executed the Rembrandt 3D Settlement Term Sheet, during the mediation. This document was signed by all parties including Magistrate Parker on April 12, 2019, and is unequivocal proof of Stastney's comprehensive knowledge of the R3D ownership rights, which he was obligated to disclose to his investors, customers and the courts.  These documents support Plaintiff's allegation that Stastney knew about R3D ownership rights while authorizing SeeCubic's development and commercial markets expansion,

27.     Following the Settlement Term Sheet Agreement of April 12, 2019 signing, Mr. Stastney and Stream Board Member Mr. Mark Coleman initiated a private mediation follow-up

conference to discuss extending the payment runway of the terms in the Settlement Agreement with the intent of maintaining the net present value of the settlement. A private meeting with counsel was held in July, 2019 resulting in an 'Extension' document being drafted. This document was never signed due to the removal of Mark Coleman and Leo Hindery Jr., Stream's board of directors. Negotiations ceased thereafter. Both of those directors, Mr. Coleman and Mr. Hindery Jr., are currently directors on the SeeCubic board, and as of at least 2019, were well aware of R3D's ownership of the intellectual property at issue.

28.     This Settlement Term Sheet Agreement of April 12, 2019 and the Definitive Settlement Agreement of May 23, 2021, which was signed by both Mathu and Raja Rajan as representative Officers of Stream and for themselves as individuals, provide a list of intellectual property licensed to Stream and specifically recites the trade secrets that are owned by R3D and licensed to Stream. Each of these trade secrets is included in the Stream products and technology that SeeCubic, Hawk, and Technovative are attempting to transfer without an assignment of the license from R3D to Stream or a direct license from R3D.

29.     These two Settlement Agreement documents are both clearly affirming market valuation of the R3D's ownership rights which were licensed for $5.8 million, and hundreds of millions in future profits, plus two million in warrants and other considerations. These substantial compensations were all agreed to in exchange for R3D licensing rights as per the Settlement Agreement documents, signed by Stastney and the Rajans. There can be no dispute that Stastney knew that he was trampling on R3D's ownership rights by authorizing SeeCubic's developmental and worldwide commercial market penetration expansion.

30.     Shad Stastney, SeeCubic's CEO, signed the initial Settlement Term Agreement on April 12, 2019 more than one year prior to the Omnibus Agreement, whichconfirms that Mr.

Stastney knew at the time of the signing of the Omnibus Agreement that Stream did not own the 3D no glasses technology, but merely had a license from R3D.  (Ex. 5.)

31.     Upon information and belief, Mr. Stastney understood that Stream needed a license because the 3DFusion technology was as foundational to their platform as was the Philips WOWvx License.

32.     Mr. Stastney had also ascertained the value of R3D's technology, and agreed to a settlement and license payment that was identical to final license terms.  Stream agreed to pay R3D $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units at cost for a total value of between $368,207,000 and $1,212,407,000.  (Ex. 2.)

33.     Mr. Stastney, thus, has been on notice since at least April 12, 2019 that subsequent efforts to develop and commercialize the technology by SeeCubic and Hawk without a license is unlawful, and a misappropriation of R3D's trade secrets.

34.     Further actions demonstrating SeeCubic's willful disregard of R3D's rights are found in the published court proceedings, post the Omnibus Agreement, in which SeeCubic states that their business is developing new products based on Stream's (R3D) technology and that the company has been turned around, and as the court notes is now 'robust'.  (Ex, 6 at 2-3.) ("Since the Court entered the Order Granting Preliminary Injunction on December 8, 2020 (Dkt. 111, the 'PI Order'), SeeCubic is thriving and has raised and deployed an excess of $10 million in order to further develop the glasses-free 3-D technology first started by Stream.  SeeCubic has purchased millions of dollars of equipment and inventory, doubled the size of its staff by (among other things) bringing back all the key members of the Ultra-D founding team from the Netherlands, who had left Stream when the Rajans were exercising control.  SeeCubic has also

reduced its debt by over 50%, and it is not in default on any debt." (internal quotations omitted)).[1]

36. SeeCubic has also demonstrated R3D's technology at trade shows, representing that R3D's technology is its own. (Exs. 7 & 8.) Further, SeeCubic provided a TV incorporating Plaintiff's patents and trade secrets to multiple entities, including one in Dubai (Ex. 9) and upon information and belief, to an entity in Korea.

36. Consequently, SeeCubic's activities to develop, commercialize and market the Ultra D 3D no glasses LCD platform technology, which they clearly state that they had acquired from Stream, was for developing the product and to make sales to customers, are all in direct violation of the R3D's ownership rights. SeeCubic could only engage in those efforts with a license. A license consistent with the one that SeeCubic's CEO had already negotiated and signed on behalf of Stream.

**FACTUAL BACKGROUND**

**THE PLAINTIFF AND ITS TECHNOLOGY**

37. Plaintiff Rembrandt is the successor-in-interest to 3DFusion, the original creator of the patents and trade secrets comprising the improved Philip's 3DASD technology (or glasses-free 3D autostereoscopic display technology). The relevant US patents include U.S. Patent Nos. 8,558,830, 9,681,114, and 9,521,390 (hereinafter, the '830, '114, and '390, patents, respectively). (Exs. 10-12.)

38. In February 2016, Mr. Stephen Blumenthal acquired all of the assets of 3DFusion, including the above-referenced patents and trade secrets comprising the 3D no glasses technology.

---

[1] Note that these are the very engineers that worked for the predecessor to R3D and SeeCubic who are stating it is further exploiting and misappropriating R3D's intellectual property.

39.     In December 2016, Mr. Blumenthal assigned all of 3DFusion's assets to Plaintiff.

40.     Mr. Blumenthal owns 100% of the outstanding shares of R3D and is the sole officer.

41.     He is also the majority shareholder, President and CEO of Rembrandt 3D Corp. ("Rembrandt – Delaware"), a Delaware corporation.

42.     Mr. Blumenthal's work with glasses free 3D technology goes back many decades and he founded 3DFusion and R3D and Rembrandt-Delaware to pursue the technology.

43.     In 2007 Philips offered to 3DFusion a 3DTV Glasses-Free 3D Auto-Stereoscopic Display ("3DASD") solution known as the WOWvx Platform for displaying glasses free 3D content and converting and generating 3D content from two-dimensional (2D) media content for rendering on Philips's 3DASD monitors.  Philips invested 500 million dollars in the WOWvx Platform because it is PC driven using mathematical algorithms to add depth and stereoscopic information to 2D content (i.e., 2D+Depth) thereby creating 3DASD content.  It is proprietary and exclusive to Philips via license access costing $100s of thousands annually.

44.     Philips licensed 23 other software 3D developers worldwide, of which 3DFusion was one of three in the U.S.  3DFusion invested in the complete Philips no glasses 3D WOWvx, 2D Plus Depth math based, digitally driven LCD platform, and licensed the WOWvx BlueBox Platform complete hardware, software and tools.  (*See* Ex. 13.)

45.     Only five other companies globally engaged the Philips technology developing both hardware and software solutions.  3DFusion was the only Philips Licensee to engage optical partners like Corning Glass for lenticular lenses development, and Purdue University for advance LIDAR depth map image processing.

46.     The reason Philips invested over half a billion dollars in the technology and developed a complete A to Z workflow replacement for industrial, consumer, commercial, scientific and military video applications was because they knew that this digital algorithm technology would replace all 2D video imaging displays globally and would likely give birth to the first trillion-dollar enterprise.

47.     The Philips 3DSolutions corporate incubator's 3DASD solution suffered from significant image quality issues because the 3DASD content generated by the WOWvx Platform contained numerous artifacts such as ghosting and required weeks of manual post-processing to correct.

48.     Through extensive experimentation and research comprising more than 3,000 hours of 2D-to-3D-depth-map, rendering and rotoscoping, Mr. Blumenthal developed a novel and non-obvious methodology to correct the image quality issues in the 3DASD content generated by the Philips WOWvx Platform.

49.     The 3DFusion technology discovery found that two of the Philips tools which they considered 'constants' could be used 'dynamically' to adjust and 'dial in the 3D image.'. Blumenthal discovered that they were in fact variables providing an 'adjustability' solution to the major artifact issues plaguing the Philips 2D Plus Depth platform.

50.     Blumenthal's patented 'adjustability' solution cured the flawed half a billion dollar Philips technology and made it a marketable product.  Due to the Eindhoven's team inability to correct these flaws, (now SeeCubic's team, previously Stream's, originally 3DFusion's), Philips in 2009 shut down its 3DSolutions incubator, releasing the Eindhoven team, who 3DFusion immediately retained.

51.     Philips had solved all of the infrastructure issues of 3DASD commercialization, (except for Plaintiff's critical solution), so the segue from their R&D to consumer home, to all the scientific geo-spatially accurate, high value applications, is virtually seamless for all math based digital feed technologies, such as lidar, radar, MRI, x-ray to name a few.  Consequently, the Philips WOWvx platform with Plaintiff's technology has virtually unlimited value, and the Defendants know it—that's why they have been fighting so fiercely to acquire control.  What is perplexing is that Hawk and SeeCubic are seeking to acquire control from entities which possess the technology but don't own it.

52.     While 3DFusion had shared some the innovations it developed in patents, many other improvements were held as trade secrets and were only disclosed and developed under non-disclosure agreements with other parties.

53.     Philips, as a global licensing high tech company, had developed massive security and ownership safeguards into the WOWvx platform so that without direct license access to the components of the technology, no outside researcher, university developer or hacker could gain access to the hardware and software needed to fix their broken machine.  Without these licensed tools from Philips, it was not possible to correct the flaws and create a marketable product.

54.     Neither Stream nor SeeCubic had this license prior to 2011.  The 3DFusion patent filing and thus R3D's technology provided the 'adjustability' key, whose essential foundation components, opened the door for all future advancements.  Philips disbanded the failed 3DSolutions Eindhoven team prior to Blumenthal's discovery, proving it had no knowledge of Blumenthal's discovery prior to meeting and working with him.

55.     At Blumenthal's Eindhoven team departure dinner, their senior graphic artist made a toast, stating, "It took a tv repair guy from upstate New York to come and show us how

to fix our 3DTV. Thank you." It was, amongst the Eindhoven team, an acknowledged fact that Blumenthal's "magic" had saved their 3DTV.

56.    In a November 10, 2010 email from Dr. Bart Barenbrug, the head software engineer for the Philips 3DSolutions Eindhoven team (for the 3DFusion team, for the Stream team and for the current SeeCubic team,) stated the following in a correspondence with the 3DFusion C.E.O., Ilya Sorokin:

> Ilya,
>
> I did download all of them this morning and afternoon (US time). I saw that in the ftp logs now, yesterday, but downloaded the proper one (if there's still time) or take an older version, if audio is needed (and it always help give more impact, imho). I made appropriate setting adjustments to maximize effects (Steve's magic). He's wizard at that for sure! and are ready to show them at the Bon Jovi event tomorrow.
>
> Great to hear that there was time. Have a great show, and we'll talk afterward, Bart.

(Ex. 14.)

57.    The former Philips technical team, now the 3DFusion Eindhoven team, in January 2010, began working under the 3DFusion Dutch entity with Blumenthal for 15 months on 30 specific customer R&D projects developing and advancing Blumenthal's patented I.P.

58.    Mr. Blumenthal and 3DFusion developed trade secrets and filed for its own patents far before Mr. Blumenthal ever met the Rajans.

59.    The first of 3 provisional patent filing dates is December 2008.

60.    In 2009, after Philips had shut down its 3DSolutions incubator, 3DSolutions' senior management saw the 3DFusion solution. Immediately the 3DSolutions senior management group took Blumenthal's solution to Philips' senior management, who immediately brought it to the attention of Philips' licensing division I.P.& S., recommending that 3DFusion be given a full license to further develop the WOWvx platform.

61.    In April of 2010, after five months of negotiating with Philips Intellectual Property and Standards division, (I.P. & S.), 3DFusion signed the first Philips Technology license for their half a billion dollar investment in the 800 WOWvx, 2D Plus Depth patents, tools, SDKs, and sublicensing rights.  (Ex. 15.)

**MEETING THE RAJANS AND STREAM**

62.    In June of 2010, Mathu and Raja Rajan came to the 3DFusion NYC showroom to view the 3DFusion Philips 3DASD unit.  Upon seeing the demonstration, they immediately signed NDAs.  (Exhibit 16.)

63.    At the time of this original June 9, 2010 NDA between Stream and 3D Fusion, (now owned by R3D), Stream had no technology of its own.

64.    In June of 2010, all rights were held by 3D Fusion and therefore all improvements to that technology made after the June 9, 2010 NDA were owned by 3D Fusion.  The NDA clearly states that all derivative improvements are owned by 3DFusion.

> 2.3.2 all inventions, improvements, copyrightable works and designs relating to business plans, marketing plans, technology, machines, methods, compositions, or products of Disclosing Party directly resulting from or relating to the Confidential Information and the right to market, use, license and franchise the Confidential Information or the ideas, concepts, methods or practices embodied therein shall be the exclusive property of the Disclosing Party, and Recipient has no right or title thereto.

(Ex. 16.)

65.    In June of 2010 the Rajans began negotiating a funding deal representing a 20-million-dollar US cable industry investor, Mr. Leo Hindery, Jr., who currently sits on the SeeCubic Board.  The original Stream and 3DFusion term sheet was negotiated for several months and then signed on September 28, 2010 by the Rajans on behalf of Stream and as individuals.  (Ex. 17.)  At that time all business plans, personnel, technology, trade secrets, key

methods and assets were disclosed to the Rajans under Due Diligence guidelines in preparation for the December 2010 funding.

66.     As part of the September 28, 2010 Term Sheet Due Diligence transfer, Walther Roelen, the managing director and salaried head of 3DFusion's Dutch BV and the Director of the Eindhoven team, came in contact with the Rajans and betrayed his fiduciary duty and orchestrated the transfer of key 3DFusion assets and conveyed the Eindhoven team to Stream TV Network in January of 2011.

67.     The Eindhoven team, having worked under Blumenthal's supervision and control for 15 months, had extensive knowledge of Blumenthal's innovations—both patented and protected as trade secrets for 3DFusion.  Eindhoven team employees, in violation of their NDAs and fiduciary duties, disclosed 3DFusion's technology, I.P. and trade secrets to Stream TV Networks, and later to SeeCubic.

68.     The original technology developed by Blumenthal and 3DFusion was disclosed to the Eindhoven team after they were terminated from the Philips 3DSolution corporate incubator due to their failure to discover Blumenthal's solution, which is the basis for the Stream improvements over the old Philips technology.  These advancements are integrated into all the Stream technology and products and are embedded in the Ultra-D 3DTV's user friendly On-Screen Display to provide customer remote control adjustability to the 3D image, among other functions.

69.     These events and agreements were the basis for the R3D lawsuit filed in January 2017 against Stream, Mathu Rajan, and Raja Rajan.

70.     3DFusion Corp. has since dissolved and all of its rights to intellectual property and technology have been assigned to R3D.

71.     Stephen Blumenthal is the sole shareholder and managing member of R3D.  R3D holds title to the intellectual property developed by Stephen Blumenthal and his former company 3DFusion Corp.

## PROCEDURAL BACKGROUND

72.     Plaintiff filed a complaint in the New York State Supreme Court in January 2017 against Stream TV Networks, Inc., Mathu Rajan, and Raja Rajan.

73.     Defendants removed the state action to the United States District Court for the Southern District of New York.

74.     R3D filed a first amended complaint.  (Ex. 1.)

## MEDIATION CONFERENCES AND THE SETTLEMENT TERM SHEET

75.     At the First Mediation Conference, held under Magistrate Judge Parker, Southern District of New York, on July 18, 2018, Plaintiff demonstrated its 3DASD original 3D technology using the original 3DFusion equipment that had been loaned to Stream in 2010. Stream had falsely claimed in a February 2011 Philadelphia newspaper article that the technology was theirs, while the laptop and media player being photographed in the article was all R3D or 3DFusion loaner equipment which they had refused to return.  (Ex. 18, Newspaper article.)

76.     After the First Mediation Conference, and for the following six months, the parties corresponded settlement terms via email and conducted several in-person settlement conferences at Stream offices in Philadelphia with Messrs. Blumenthal, Michaels, and Wallace representing the Plaintiff, and Mr. Raja Rajan representing the Defendants.

77.     The parties exchanged various redlined proposals and R3D continued to informally share additional evidence documenting the various trade secrets and prior

communications between the Eindhoven team and 3DFusion, verifying the R3D IP ownership. At no time did Stream present any evidence to the contrary.

78.    On January 11, 2019, more than six months after the First Mediation Conference, Magistrate Judge Parker ordered parties to attend a second settlement conference in person with counsel on April 9, 2019 (the "Second Mediation Conference").  The parties negotiated the various terms from the previously developed Redlined Term Sheet through Magistrate Parker. Magistrate Parker had ordered that all parties with the authority to bind their respective companies attend the Second Mediation Conference in person with counsel on April 9, 2019. ("The Second Mediation Conference".)  At this meeting the parties negotiated the various terms from the previously developed Redlined Term Sheet through Magistrate Parker.

79.    By late afternoon, after the parties reached mutual agreement to the various negotiated changes to the Redlined Term Sheet, Mr. Kronley, attorney for Stream, made hand-written agreed modifications thereto; the parties, with Mr. Stastney representing Stream and Mr. Blumenthal representing R3D, then indicated assent by mutually initialing the modified Redlined Term Sheet; Magistrate Judge Parker then affixed her signature thereto (the "Settlement Term Sheet" attached as Ex. 5).

80.    As part of these negotiations, a list of R3D Trade Secrets was developed and included as an exhibit to the drafts of settlement term sheets, specifically, the parties had agreed that the following list of R3D trade secrets were to be licensed to Stream as part of any

settlement and were included in the Second Mediation Conference Settlement Agreement,

---

**SCHEDULE A**

1. Knowhow and trade secrets related to methodology for:
a. efficiently converting, correcting and optim  ng a 2D+Depth video for playback on a 3D autostereoscopic as     iated with the Phi  p  technology
b. utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.
c. utilizing the On Screen Display functions of Borders and "Liveliness."
2. Trademarks
3. the patents asserted in Remb  andt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)

---

81.     R3D, Stream, Mathu Rajan, and Raja Rajan via phone, attended the Second Mediation Conference in Magistrate Parker's chambers, reached an initial Settlement Term Sheet executed by Stream's CFO, Shadron Stastney (executing on behalf of Stream), on April 9, 2019, and signed by Magistrate Parker and the parties.  Mr. Stastney is currently the CEO of SeeCubic.

82.     The Settlement Term Sheet executed by Mr. Stastney did not modify the list of licensed trade secrets from prior drafts of the terms exchanged between counsel for the parties with the immediate draft prior to the settlement conference having been draft by DLA Piper (counsel for Stream working with Mr. Stastney) and the revisions during the conference were all made by Mr. Kronley of DLA Piper, representing Stream and the Rajans.

83.     Eventually, R3D, Stream, Mathu Rajan, and Raja Rajan fully executed a settlement agreement on May 23, 2021 that included the same list of R3D trade secrets used in the previous Settlement Term Sheet.

84.     While capably represented by DLA Piper and under review and approval of Magistrate Parker, R3D, Stream, Mathu Rajan, Raja Rajan, and Shadron Stastney all approved of the list of trade secrets owned by R3D and licensed to Stream.

85.     Every TV sold by Stream incorporated the know-how and trade secrets and, but for the license, infringed the patents referenced in the term sheet, so this settlement was and is essential for Stream (or any assignee or successor) to continue selling product free of infringement allegations.

86.     Given that Stream's intent is to operate as a manufacturer, R3D and Stream designed a Non-Exclusive License which would support that strategy.  Therefore, Stream agreed to pay R3D $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units at cost.  (Ex. 2.)

87.     R3D's SDNY case's final Settlement Agreement was signed by R3D, Stream, Mathu Rajan, and Raja Rajan on May 23, 2021 ending the dispute and acknowledging R3D's ownership rights to the technology and Stream's need for a license.

88.     Despite having knowledge of R3D's intellectual property rights and the trade secret claims, neither Shadron Stastney nor SeeCubic ever provided R3D with notice of the Omnibus Agreement or SeeCubic's attempts to transfer R3D's technology to its control.

89.     R3D became aware of Stream's Chapter 11 bankruptcy proceeding from public notice.  Through its counsel, R3D sent an email to Stream's bankruptcy counsel (Ex. 19), the counsel for creditors (Ex. 20), and the counsel for SeeCubic (Ex. 21) on April 20, 2021 to make sure they each knew about R3D's ownership of the technology and to invite resolution.

90.     R3D also joined with other creditors to pursue an involuntary bankruptcy petition for Stream and as part of its filings in support of the involuntary petition, R3D filed declarations by Stephen Blumenthal (Ex. 22) and Christopher Michaels (Ex. 23).

91.    Prior to this filing, R3D has sent direct communications to counsel for both SeeCubic, Hawk, and Technovative putting them on notice of R3D's rights, yet all three entities continue pursue attempts to take possession of and use R3D's technology without a license.

## SUMMARY OF THE TRADE SECRETS – OVERVIEW OF THE EINDHOVEN TEAM AND 3DFUSION CONNECTION

92.    The trade secrets reflect a wide range of improvements developed by Mr. Blumenthal and the 3DFusion team from 2007 to 2011.

93.    The 3DFusion Eindhoven team were required to sign NDAs for Philips I.P.& S. on behalf of the 3DFusion EU B.V. as noted in the 3DFusion company meeting minutes, and on behalf of 3DFusion USA.  It is clear that the Eindhoven team represented themselves as part of the 3DFusion team with the authority to bind 3DFusion and 3DFusion EU B.V. to contracts.

94.    Walther Roelen was hired as 3DFusion EU B.V. C.E.O. in May of 2010. Roelen's role as C.E.O. of 3DFusion EU, B.V. is verified by his bank account salaried payments, Dutch Corporate documents, his emails stating his C.E.O. status, his signed NDA, and his email confirming the 30 developmental projects in which he directed the team's activities during the 2010 15-month R&D cycle.

95.    Roelen was the primary individual to whom 3DFusion and the Eindhoven team looked to for leadership, guidance and to exercise his fiduciary responsibility to protect 3DFusion's IP and trade secret discoveries.  Roelen betrayed this trust and actively engaged in sabotaging 3DFusion EU's efforts by violating his ethical, technical, and fiduciary responsibilities.

96.    During this time, the team generated approximately 2,000 pages of emails, 1,000 pages of documents, and spent 1,000s of hours working on content and sharing ideas and advancements.  No attempt is made herein to explain all facets of each development, but rather to

provide a reasonable summary of the technology in question that was unique and proprietary to 3DFusion and now R3D.

### I. Relative Harm to Parties

#### R3D

97.     While negotiating the relative value of a fair settlement between R3D and Stream, both parties referenced the cost of obtaining a non-exclusive license to the underlying Philips technology and the cash component of the license was set at a similar value.

98.     Notably, the Philips technology was seriously flawed until Mr. Blumenthal applied his technical improvements.  Indeed, R3D had previous versions of the old Philips 3D sets and had provided demonstrations of how the Philips technology looked without R3D's technical improvements and the knowhow and trade secrets licensed to Stream.

99.     SeeCubic and Hawk are seeking to take R3D's technology without similar compensation for the license—indeed, SeeCubic has already claimed to ***own*** the technology despite the fact that R3D has only licensed the patents and trade secrets comprising the no glasses 3D technology.  The harm to R3D is (1) the destruction of its trade secrets, and (2) the use of said trade secrets and the patented technology without a license by SeeCubic and Hawk.

100.     R3D is free to license others and seek similar licenses.  However robust SeeCubic has become, they are not nearly as capable of a partner as Sony, Sharp, Samsung, LG, or any of the major LCD manufactures such that the value that R3D could expect from licensing its technology to other vendors is much higher.

101.     Further, R3D is actively seeking products for its own use, design collaborations to seek its own specification for particular and specialized applications.

102.     If Hawk or SeeCubic are allowed to transfer R3D's intellectual property without a license from R3D to other vendors, the damage to R3D will be irreparable and immediate and

will cut off R3D's ability to negotiate its own licenses and to control the specifications of glasses 3D products entering the marketplace. These damages cannot be fully addressed by monetary relief.

## Hawk

103.    Hawk is not authorized to use R3D's technology and does not have a license to use R3D's knowhow, trade secrets, or patents.

104.    Hawk has threatened the sale of R3D's intellectual property, including its trade secrets (Ex. 4 at 17), which will cause irreparable harm to Plaintiff as once the trade secrets are disclosed any TV manufacturer or other receiving company could use them thereby destroying R3D's trade secrets.

## SeeCubic

105.    SeeCubic is not authorized to use Plaintiff's technology and does not have a license to use Plaintiff's knowhow, trade secrets or patents.

106.    SeeCubic's threatened and actual misappropriation of Plaintiff's intellectual property, including its trade secrets, will cause and has caused substantial injury to Plaintiff.

## Technovative

107.    Technovative is a wholly owned subsidiary of Stream, the latter of which possesses a license from R3D. Pursuant to the terms of the license, Technovative can only use R3D's technology to manufacture or distribute for the benefit of Stream and R3D. Upon information and belief, Hawk seeks to take control of Technovative for the purpose of selling intellectual property that includes R3D's technology—which Technovative does not own. Such a sale would cause irreparable harm to R3D as the dissemination of the trade secrets could never be contained or licensed.

**R3D'S CAUSES OF ACTION**

**COUNT I-Injunction Against Hawk**

108.    R3D incorporates by reference and realleges the preceding paragraphs 1 through 107 as if fully set forth herein.

109.    Delaware Code Title 6, Subtitle 11, Chapter 20, section 2002 states that "Actual or threatened misappropriation may be enjoined."

110.    Section 2001 defines misappropriation as "Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."

111.    Upon information and belief Hawk is aware that R3D owns its technology, that the technology is licensed to Stream, and that removing R3D's technology from Stream without a license from R3D would both cause Stream to breach its license with R3D and would be a misappropriation of R3D's trade secrets.

112.    Despite this actual notice of R3D's rights, Hawk has pursued actions to transfer control of R3D's technology outside of Stream to their own control and use.

113.    Hawk does not currently have a license from R3D.

114.    The potential misappropriation and breach of contract can be avoided if R3D's 3D No Glasses Technology does not leave Stream (or Technovative, if it has been assigned the license), or if the license agreement is assigned to the party taking possession of the technology along with the obligations under the license.

115.    The sale of R3D's assets would cause irreparable harm for which money damages would not adequately compensate R3D.  Plaintiff is therefore entitled to enjoin Hawk from selling, transferring, disposing, or assigning R3D's intellectual property to any party that does not possess a license.

## COUNT II-Injunction Against Technovative

116.    R3D incorporates by reference and realleges the preceding paragraphs 1 through 115 as if fully set forth herein.

117.    Pursuant to the Hawk lawsuit, Technovative may come under the control of Hawk which has publicly stated it then intends to have Technovative sell or transfer R3D's assets in derogation of R3D's rights.  Technovative is barred from such sale or transfer pursuant to the license agreement from R3D.  Such sale or transfer would irreparably harm R3D and money would not adequately compensate R3D.  R3D is entitled to enjoin Technovative from selling, transferring, disposing or otherwise assigning R3D's technology assets to any party unless that party has a license from R3D or assigned from Stream and fully complies with its terms.

## COUNT III-Actual Misappropriation by SeeCubic

118.    R3D incorporates by reference and realleges the preceding paragraphs 1 through 117 as if fully set forth herein.

119.    Indeed, SeeCubic brazenly markets R3D's Technology as its own: "SeeCubic is currently focused on working together with top-tier home and mobile device brands via strategic partnerships to deliver spectacular viewing experiences to all consumers.  We are bringing our technology to all popular device types we all use on a daily basis –televisions, mobile devices, computer screens, and even in-car displays."  (Ex. 24.)

120.    Upon information and belief, SeeCubic has been using R3D's trade secrets for the purpose of advancing development of glasses-free 3D displays which constitutes a willing disclosure and misappropriation of R3D's trade secrets by SeeCubic.

121.    SeeCubic is managed by Shadron Stastney.  Mr. Stastney negotiated the license that Stream obtained to utilize the technology.  Mr. Stastney had actual knowledge of the misappropriation because he knew that Plaintiff owned the technology and that Stream needed a

license to possess and utilize it.  Nevertheless, Mr. Stastney has acted without a license. Additionally, SeeCubic and Hawk were both apprised of R3D's rights in an email from its attorney, Chris Michaels, Esq. on April 20, 2022.  (Emails attached as Exs. 25 & 26.)

122.    SeeCubic does not have, nor has it ever had, a license to utilize Plaintiff's technology and its actual misappropriation has damaged Plaintiff.  Under no circumstance does SeeCubic's or Hawk's control of Technovative provide SeeCubic with ownership of R3D's technology.  R3D licensed its technology to Stream.  (Ex. 2.)

123.    Upon information and belief SeeCubic's attempts to share R3D's trade secrets will result in the destruction of the trade secrets, and will cause significant harm to R3D.

### COUNT IV-Injunction Against SeeCubic

124.    R3D incorporates by reference and realleges the preceding paragraphs 1 through 123 as if fully set forth herein.

125.    In a letter dated August 2, 2022, Skadden Arps attorney, Jenness Parker, Esq., wrote to Vice Chancellor The Hon. J. Travis Laster stating that its client, SeeCubic, "SeeCubic is exercising its right to possession of then collateral under Article 9 of the UCC and the security documents.  It is also in the process of retaining an investment banker and will be pursuing a public sale of the assets to satisfy the debt that Stream has failed to pay for well over two years now."  (Ex. 27.)

126.    SeeCubic's intent to sell Plaintiff's assets violates Delaware Code Title 6, Subtitle 11, Chapter 20, section 2002.

127.    SeeCubic has knowledge of Plaintiff's ownership rights and the sale of Plaintiff's assets would cause irreparable harm to Plaintiff.

128.    SeeCubic does not have a license and has no right to possess, sell or transfer R3D's 3D no glasses technology.  Its threat to do so should be enjoined.

26

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for itself and against Defendants as follows:

A.  An adjudication that Defendants have misappropriated Plaintiff's trade secrets;

B.  An injunction against Defendants preventing the transfer of trade secrets licensed to Stream;

C.  A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of Plaintiff's reasonable attorneys' fees, and

D.  An award to Plaintiff of such further relief at law or equity as the Court deems just and proper.


Dated:  February 21, 2023


*s/ Andrew DeMarco*
Andrew DeMarco, Esq. (DE No. 6736)
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
ademarco@devlinlawfirm.com

*Attorneys for Plaintiff*
*Rembrandt 3D Holding Ltd*