# EXHIBIT 2

EFiled: Nov 14 2022 05:40PM EST
Transaction ID 68385020
Case No. 2022-0930-JTL

# EXHIBIT 6

**THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE** (this "Agreement") is entered into as of May 23, 2021 (the "Effective Date"), by and among, **Stream TV Networks, Inc.**, a Delaware corporation (the "Company" or "Stream TV"), **Mathu Rajan** ("M. Rajan"), and **Raja Rajan** ("R. Rajan," and, together with the Company and M. Rajan, collectively, the "Company Parties"), on the one side, and **Rembrandt 3D Holding LTD**, a Nevis corporation ("Rembrandt") on the other side. Each of the Company Parties and Rembrandt are referred to herein collectively as the "Parties" and each as a "Party".

<h3 style="text-align:center">BACKGROUND</h3>

Stream TV is a Philadelphia-based new media company created to serve a consumer market seeking enhanced entertainment and communications experiences through devices with unlimited accessibility and superior quality;

Rembrandt is the successor to 3DFusion Corp. ("3D Fusion");

On January 6, 2017, Rembrandt filed suit against the Company in the Supreme Court of New York, New York County, which the Company removed to the U.S. District Court for the Southern District of New York captioned Rembrandt 3D Holding LTD v. Stream TV Network, Inc., et al., No. 17 Civ. 00882 (RA) (KHP) (S.D.N.Y.) (the "Litigation");

This Agreement details a global settlement arrangement between Stream and Rembrandt, intended to settle all disputes between them, existing as of the effective date of May 23, 2021 ("Effective Date"). This Agreement is subject to the Protective Order (Docket No. 60) signed by the Parties in the Litigation.

Without admitting liability for any claim or damages, the Parties to this Agreement desire to settle the Litigation and agree to enter this Settlement Agreement and Mutual Release.

NOW THEREFORE, in consideration of the mutual promises, covenants, undertakings and agreements set forth herein, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Confidentiality:  The Parties have executed a Protective Order in the Litigation (Docket No. 60) and the terms of the Protective Order shall cover this Agreement.

2. Costs and Expenses  Each Party shall be responsible for its own costs and expenses in negotiating the terms of this Agreement.

3. Law:  This Agreement shall be governed by the laws of Delaware, without regard to its conflict of law principles.

4. Commencement  Commencement of this intended settlement shall be triggered upon the execution of this Agreement and the Warrant

Agreement (Exhibit A) (which is incorporated herein by reference) and the attached Stipulation Of Voluntary Dismissal Pursuant To F.R.C.P. 41(a)(1)(A)(ii) (Exhibit B) which will be executed immediately after execution of this Agreement.

5. General Release

a. Each of the Company Parties and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys do hereby fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises, obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have, or have had, past, present, or future, against Rembrandt and its predecessors, successors, affiliates, subsidiaries, agents, officers, directors, members, managers, employees, owners and shareholders, relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

b. Upon payment of all payments under Section 15. Consideration, each of Rembrandt and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys agree to fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have,

or have had, past, present, or future, against any of the Company Parties and their respective predecessors, successors, affiliates, subsidiaries, agents, officers, directors, employees, and shareholders (and, in the case of M. Rajan and R. Rajan, their respective heirs, personal representatives, executors, and administrators) relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

6. Products

(a) Provision of 4K Units – Stream TV will ship to Rembrandt 100 of the following units: Display/Monitor Model: SC65D21Q-4K 65" Ultra-D Display (the "4K Units"). It is understood by the Parties that the 4K units will be provided "as is" and have no warranty or returnability available. Rembrandt will provide Stream TV with written notice ("Delivery Notice") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice. Stream will pay transportation and all importation costs of these units. Upon execution of this Agreement Stream TV will notify Rembrandt if it will not be able to deliver any of the 4K Units and $5,250.00 will be added to the consideration under Section 15. A. for each 4K Unit that Stream TV can not provide upon execution or Stream TV will agree to provide additional 8K prototype units as a replacement for the 4K units to be delivered at up to 10 units/month starting seven months after Prototype Commencement.

(b) High Resolution Units

(1) As Stream TV builds 8K resolution units, after the Agreements are mutually executed, Stream will provide Rembrandt with eight prototypes as follows:

i) the first unit within one month of the first prototype created by Stream TV of an 8K resolution unit after execution of this Agreement ("Prototype Commencement");

ii) 2 units on or before three months from Prototype Commencement;

iii) 2 units on or before four months from Prototype Commencement; and

iv) 3 units on or before six months from

Prototype Commencement.

Stream TV will warehouse such 4K and 8K units (for the 4K units and prototypes of the 8K) in facilities until shipping is requested by Rembrandt to a destination within the United States. Rembrandt will provide Stream TV with written notice ("Delivery Notice of Prototypes") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice of Prototypes. Stream TV will pay transportation and all importation costs of these units. The default is that the Delivery Notice of Prototypes is to the location of 128 Bull Hill Road, Newfield New York, 14867.

It is understood notwithstanding anything to the contrary Stream TV is not obligated to hold those samples for Rembrandt if the is a change to the default location Rembrandt is unwilling to ship the units within seven days of them being completed and in such case Stream TV may use those prototypes for any purpose thereafter without any obligation to Rembrandt.

(2) Standard Products - As Stream TV builds high-resolution based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost, and otherwise at standard commercial terms, the minimums provided below. It is understood by both Parties that Stream TV is not required to change its business model which may or may not include completing finished units. If Rembrandt accepts the order and meet the financial and volume requirements required by Stream TV, then Rembrandt will retain this option. If Rembrandt does not exercise this option with a specific plan within seven (7) business days, then Stream TV can offer this inventory to other customers as needed. Rembrandt will have a minimum right of first refusal to purchase Standard Products At Cost on 63,000 units plus and 7,000 units/month on execution of this Agreement and then increasing by 1,000 units/month every three months thereafter until the end of term.

Such minimum right of first refusal is cumulative and if Stream TV is not in production or Rembrandt does not use such right within a given month it carries over to future months. Rembrandt may purchase additional units by paying standard commercial terms with most favored nation status on a per unit price basis and similar shipping terms.   At present the following products defined in the attached specification sheets provided by Stream TV on June 13, 2019 are Standard Products attached hereto as Exhibit B, which is incorporated herein by reference.)

(3) Title for each of the Units shall transfer to Rembrandt, and risk of loss will be assumed by Rembrandt, upon delivery of each such Unit.

(4) Tax Matters.  Rembrandt shall be solely responsible for any taxes chargeable to the purchaser of goods in connection with or arising out of the transfer of the Units. Stream TV shall be solely responsible for any taxes chargeable to the seller of goods in connection with or arising out of the transfer of the Units.

| | |
|---|---|
| 7.  OEM | Stream TV in good faith is not finishing products but will recommend to Rembrandt certain Original Equipment Manufacturers ("OEM") that Rembrandt may wish to utilize after it fully investigates the finished products capabilities under its specifications; however, the selection of OEM(s) is at Rembrandts discretion. In such case Stream TV will provide the 3D components directly to the OEM with Rembrandt's specifications. |
| | White Label - Rembrandt may brand product purchased from Stream TV with Rembrandt trademarks.  Rembrandt will not remove any patent number marking applied by Stream. |
| 8.  Term | The Term of the Agreement shall continue through December 31, 2030. |
| 9.  Rembrandt Grant of Rights | Rembrandt hereby grants a non-exclusive license to Stream TV to all Rembrandt Technologies listed in Schedule A to this |

{00843971.DOCX 1}

Agreement for Rembrandt.

| | |
|---|---|
| 10. Stream Grant of Rights | Stream TV hereby grants Rembrandt a non-exclusive license to any existing Stream technologies that Stream TV has the right to license/sub-license solely to enable Rembrandt to distribute Products described herein. Rembrandt shall obtain or reimburse Stream for Stream's Philips license as part of the At Cost price, as applicable. |
| 11. Field | The licensed field of use from Rembrandt to Stream TV is all applications

The licensed field of use from Stream TV to Rembrandt is all applications. |
| 12. Territory | All territories whether or not patents are issued or pending or licensed. Sale to any distributor in any territory is permitted for the Field. |
| 13. Co-Marketing | Rembrandt and Stream TV shall work cooperatively to educate and co-market the benefit of the no glasses 3D technology and agree to not disparage the other Party.

Stream will be responsible for its own sales and marketing expenses and Rembrandt will be responsible for their own sales and marketing expenses. |
| 14. Sub-license | Either Party may sublicense their rights to other parties for the purpose of having products distributed by the Party. |
| 15. Consideration | In addition to the product provided as consideration and described above, Stream TV shall provide the following as consideration:<br>a) Upon execution of this Agreement, Stream TV agrees to pay to Rembrandt the lump sum of one million five hundred twenty eight thousand ($1,528,000) USD and is due immediately.<br>b) Stream TV is providing  warrants equal to X% of the outstanding stock in Stream TV after Stream TV has raised at least sixty million dollars in capital in excess of all outstanding debt and currently liabilities, with provision of a cashless exercise price at a $$Y value per warrant, pursuant to the attached Warrant Agreement (Exhibit A), which is incorporated herein by reference. |

{00843971.DOCX 1}

"X%" shall be equal to the 2,000,000/(the number of shares in Stream TV outstanding on April 9, 2019). "$Y value" shall be equal to (the book equity value of Stream TV at issuance)/(the number of shares in Stream TV outstanding at issuance)

c) Stream TV will pay Rembrandt a monthly fee ("Monthly Payment") beginning with the execution of the Agreement for the full Term of this Agreement, according to the following schedule:

    a. 12 months @ $28,000/per month
    b. 12 months @ $32,000/per month
    c. 12 months @ $36,000/per month
    d. 79 months @ $40,000/per month

    The monthly payments shall be accelerated upon a merger, acquisition, or change of control. No acceleration by IPO.

**16. Payments**

Stream TV shall pay each Installment and Monthly Payment by wire transfer of immediately available funds to an account designated by Rembrandt in writing below, or otherwise designated by Rembrandt in writing and delivered to mathu@streamacquistiongroup.com:

Eng Law Firm, Attorney Trust Account [TD Bank A/C# 4327484509 ABA# 031201360].

**17. Representations and Warranties**

The Parties represent and warrant to one another that they will not bring a trade secret claim based upon any information that is the basis for the Litigation or was otherwise disclosed of learned during the pendency of the Litigation.

Stream TV represents and warrants that it has not revived and will not revive any abandoned patents or patent applications that were abandoned prior to the Effective Date.

Each of the Parties hereby represents and warrants to the others that, as of the Effective Date, (i) it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery, and performance of this Agreement have been duly authorized by all necessary corporate or company action on its behalf, (iii) this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation enforceable against it in accordance with the terms

of this Agreement, (iv) each individual signing this Agreement in a representative capacity acknowledges and represents that he/she is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated Party; and (v) the agreements and understandings identified herein constitute all of the agreements and understandings between and among the Parties with respect to the subject matter hereof.

18. Notices          Notices required by this Agreement shall be submitted either by any form of overnight courier or by hand delivery, and simultaneously by e-mail, as follows:

To Stream TV, Raja Rajan & Mathu Rajan:
Stream TV Networks, Inc
2009 Chestnut Street
3rd Floor
Philadelphia, PA 19103
Attention: General Counsel, Mathu and Raja Rajan individually

and

XXX

To Rembrandt:
128 Bull Hill Road
Newfield, New York  14867
Attention: Stephen Blumenthal
Email: Stephen3d@mac.com

and

Eng Law Firm
369 Lexington Ave., 2nd Floor
New York, New York  10017
Attention: Chi Eng
Email: chi@englawfirm.com

Brown & Michaels, PC
118 N. Tioga St, 4th Floor
Ithaca, NY 14850
Attention: Christopher Michaels
Email: michaels@bpmlegal.com

{00843971.DOCX 1}

| 19. Advice of Counsel | Each Party has been represented by counsel of its own selection, has reviewed this Agreement, has had the terms of this Agreement explained by counsel, and understands the contents and effect of this Agreement. Each Party enters into this Agreement wholly upon each Party's own respective judgments, beliefs and knowledge of the matters set forth herein and on the advice of each Party's own respective attorneys. |
|---|---|
| 20. Entire Agreement | It is expressly understood and agreed that this Agreement along with all of the following documents: 1) the Warrant Agreement; and 2) the Protective Order in the Litigation (Docket No. 60) constitutes the entire and complete understanding and agreement among the Parties hereto in regard to the subject matter of the dispute described above and the terms hereof, and supersedes and replaces all prior negotiations, agreements or understandings among the Parties, whether written or oral, concerning the subject matter of this Agreement. Each of the Parties acknowledges and represents that no other Party or agent or attorney of any other Party has made a promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter of this Agreement. Each Party acknowledges and represents that it has not executed this Agreement in reliance upon any promise, representation, or warranty whatsoever that is not expressly set forth in this Agreement. |
| 21. Severability | If any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Agreement, and the validity, legality, and enforceability of the remaining provisions of this Agreement shall not be adversely affected or impaired, and shall remain in full force and effect. |
| 22. Binding Effect | This Agreement shall be binding on, and shall be enforceable against, and shall inure to the benefit of the Parties to this Agreement and their respective past and present officers, directors, affiliates, member firms, subsidiaries, parents, successors, shareholders, members, partners, general partners, limited partners, principals, participating principals, managing members or other agents, management personnel, attorneys, servants, employees, representatives of any other kind (and any officers, directors, members or shareholders of |

any of the foregoing which are not natural persons), spouses, estates, executors, estate administrators, heirs, and assigns.

23. Waiver and Amendment

No provision of or rights under this Agreement may be waived or modified unless in writing and signed by the Party whose rights are thereby waived or modified. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided. This Agreement may not be amended except through an instrument in writing signed by the Parties hereto.

24. Further Assurances

Each Party shall cooperate fully in the execution and delivery of this Agreement and shall take, or cause to be taken, such further action as may be reasonably necessary or appropriate to effectuate or facilitate the terms of this Agreement, including the execution and delivery of any further documents that may be necessary or appropriate for that purpose. Each Party further agrees to take no action, directly or indirectly, to avoid or circumvent, in whole or in part, the terms of this Agreement.

25. Costs

The Parties acknowledge that each Party is to bear its own costs, fees, and expenses, including attorneys' fees, incurred in connection with the dispute giving rise to this Agreement.

26. Dispute Resolution

In the event of a dispute arising from this Settlement Agreement, the parties agree to resolve such dispute in good faith within fifteen (15) business days of receipt of notice of such dispute. If the parties fail to resolve such dispute, the parties consent to initially seek mediation by the Court in the Litigation, which Court the parties also agree shall maintain jurisdiction over any dispute arising from this Agreement.

27. Right to Attorney's Fees in Case of Breach

In the event of any dispute or litigation arising out of or concerning this Agreement, the prevailing Party shall be entitled to an award against the non-prevailing Party of its reasonable attorney's fees and costs.

28. Headings

The various headings of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

| 29. Counterparts and Transmission of Signatures | This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Original signatures transmitted by electronic mail or facsimile shall be deemed to be original signatures. No Party shall be bound hereby unless and until all other Parties have executed this Agreement. |
|---|---|
| 30. Authorized Signature | Each individual signing this Agreement in a representative capacity acknowledges and represents that he is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated corporation, partnership, limited liability company, trust or other entity. |
| 31. Joint Preparation | This Agreement shall be deemed to have been prepared jointly by the Parties, and any uncertainty or ambiguity existing herein shall not be interpreted against any Party by reason of its drafting of this Agreement, but shall be interpreted according to the application of the general rules of interpretation for arm's length agreements. |

IN WITNESS WHEREOF, the Parties do hereby execute this Agreement by duly authorized representatives as of the Effective Date:

**Signed for and on behalf of Defendants:**

Signature
STREAM TV NETWORK, INC.,

By: Mathu Rajan, Chief Executive Officer

Date: May 23, 2021


Signature
Mathu Rajan, Individually

Date: May 23, 2021


Signature
Raja Rajan, Individually

Date: May 23, 2021

**Signed for and on behalf of Plaintiff:**

Signature
REMBRANDT 3D HOLDING LTD

By: Stephen Blumenthal, President/CEO

Date: May 23, 2021

{00843971.DOCX 1}

SCHEDULE A

1. Know how and trade secrets related to methodology for:
    a. efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology
    b. utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.
    c. utilizing the On Screen Display functions of Borders and "Liveliness."
2. Trademarks
3. The patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)

Exhibit A

(Warrant Agreement)

# WARRANT

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE COMPANY REQUESTS, AN OPINION SATISFACTORY TO THE COMPANY TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL.

Warrant Certificate No.:
Original Issue Date:

FOR VALUE RECEIVED, Stream TV Networks, Inc., a Delaware USA corporation (the "**Company**"), hereby certifies that Rembrandt 3D Holdings, Ltd ("Rembrandt") is a Nevis corporation with an office at 128 Bull Hill Road, Newfield, New York 14867, or its registered and permitted assigns (the "**Holder**"), is entitled to purchase from the Company XXX (XXX) duly authorized, validly issued, fully paid and non-assessable shares of Common Stock at a purchase price per share of $YYY (the "**Exercise Price**"), all subject to the terms and conditions set forth below in this Warrant. Certain capitalized terms used herein are defined in **Section 1** hereof.

1. Definitions. As used in this Warrant, the following terms have the respective meanings set forth below:

"**Aggregate Exercise Price**" means an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to **Section 3** hereof, multiplied by (b) the Exercise Price in accordance with the terms of this Warrant.

"**Board**" means the board of directors of the Company. "**Business Day**" means any day, except a Saturday, Sunday or legal holiday, on which banking institutions in New York City are authorized or obligated by law or executive order to close.

"**Common Stock**" means the Class A Common Stock, par value $0.00001 per share, of the Company, and any capital stock into which such Common Stock shall have been converted, exchanged or reclassified following the date hereof.

"**Exercise Date**" means the date on which the conditions to such exercise as set forth in **Section 3** shall have been satisfied at or prior to 5:00 p.m., New York time, on a Business Day, including, without limitation, the receipt by the Company of the Exercise Agreement, the Warrant and the Aggregate Exercise Price.

"**IPO**" means the Company's first underwritten public offering of its Common Stock under the Securities Act.

"**Liquidity Event**" means any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, or an Initial Public Offering (IPO) or sale of the Company by either stock or assets that is at least a change of control transaction.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, corporation, joint venture, trust, incorporated organization or government or department or agency thereof.

"**Termination Date**" means the date the Warrant expires, unless exercised earlier as provided herein, and such date being 5:00 p.m., New York City time, on the twentieth (20th) anniversary of the date hereof.

"**Warrant**" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"**Warrant Shares**" means the shares of Common Stock purchasable upon exercise of this Warrant in accordance with the terms of this Warrant. 2. Term of Warrant. Subject to the terms and conditions hereof, the Holder may only exercise this Warrant, in whole or in part, for the Warrant Shares purchasable hereunder during the Exercise Period. The "**Exercise Period**" shall be from the Liquidity Event until the Termination Date. In the event that the Company is a party to a Liquidity Event or otherwise has knowledge thereof, the Company shall provide advance written notice thereof to Holder. 3. Exercise of Warrant.

(a) **Exercise Procedure**. This Warrant may be exercised, in whole or in part, at the option of the Holder, on any Business Day during the Exercise Period, for the Warrant Shares, upon:

(i) surrender of this Warrant to the Company at its then principal executive offices (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft or destruction), together with an Exercise Agreement in the form attached hereto as **Exhibit A** (an "**Exercise Agreement**"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and

(ii) payment to the Company of the Aggregate Exercise Price in accordance with **Section 3(b)**.

(b) **Payment of the Aggregate Exercise Price**. Payment of the Aggregate Exercise

Price shall be made, at the option of the Holder, by either of the following methods:

(i) delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to the following account of the Company: HSBC Bank USA NA, 120 Broadway, New York NY 10271, USA, Fed ABA Routing # 021001088, SWIFT Code # MRMDUS 33, Account #221049207 (Stream TV Networks, Inc.) or otherwise to an alternative account designated in writing in advance by the Company, in the amount of such Aggregate Exercise Price; or

(ii) by instructing the Company to issue Warrant Shares then issuable upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the Holder shall surrender this Warrant in exchange for the number of Warrant Shares as is computed using the following formula:

$$X = Y (A - B) \div A$$

Where
:

$X$ = the number of Warrant Shares to be issued to the Holder.

$Y$ = the total number of Warrant Shares for which the Holder has elected to exercise this Warrant pursuant to Section 3(a).

$A$ = the fair market value of one Warrant Share as of the applicable Exercise Date; whereby for purposes of this section "fair market value" shall be defined as (i) the average of the closing sale prices of the Common Stock for the five (5) trading days immediately prior to (but not including) the Exercise Date in the event that the Company's Common Stock is traded on an exchange or is quoted on an over the counter market, or in the absence of a trading market for the Common Stock, then (ii) as the Holder and the Company agree, or in the absence of such an agreement, by arbitration in accordance with the rules then standing of the American Arbitration Association, before a single arbitrator to be chosen from a panel of persons qualified by education and training to pass on the matter to be decided

$B$ = the Exercise Price in effect under this Warrant as of the applicable Exercise Date.

(c) **Delivery of Stock Certificates**. Upon receipt by the Company of the Exercise Agreement, surrender of this Warrant and payment of the Aggregate Exercise Price (in

accordance with **Section 3(b)** hereof), the Company shall, as promptly as practicable, and in any event within three (3) Business Days thereafter, execute (or cause to be executed) and deliver (or cause to be delivered) to the Holder a certificate or certificates representing the Warrant Shares issuable upon such exercise. The stock certificate or certificates so delivered shall be, to the extent possible, in such denomination or denominations as the exercising Holder shall reasonably request in the Exercise Agreement and shall be registered in the name of the Holder or, subject to compliance with **Section 4** below, such other Person's name as shall be designated in the Exercise Agreement. This Warrant shall be deemed to have been exercised and such certificate or certificates of Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(d) **Fractional Shares.** The Company shall not be required to issue a fractional Warrant Share upon exercise of any Warrant. As to any fraction of a Warrant Share that the Holder would otherwise be entitled to purchase upon such exercise, the Company shall pay to such Holder an amount in cash (by delivery of a certified or official bank check or by wire transfer of immediately available funds) equal to the product of (i) such fraction multiplied by (ii) the Exercise Price of one Warrant Share on the Exercise Date.

(e) **Valid Issuance of Warrant and Warrant Shares**. With respect to the exercise of this warrant, the Company hereby represents, covenants and agrees that:

(i) This Warrant is duly authorized and validly issued. (ii) All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be necessary or appropriate in order that such Warrant Shares are, validly issued, fully paid and non-assessable.

(f) **Conditional Exercise**. Notwithstanding any other provision hereof, if an exercise of this Warrant is to be made in connection with a Liquidity Event, such exercise may at the election of the Holder be conditioned upon the consummation of such Liquidity Event, in which case such exercise shall not be deemed to be effective until immediately prior to the consummation of such Liquidity Event.

(g) **Reservation of Shares**. Immediately prior to the exercise of this Warrant, the Company shall reserve and keep available out of its authorized but unissued Common Stock, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the Exercise Price. The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid

and non-assessable shares of Common Stock upon the exercise of this Warrant.

(h) **Adjustment of Exercise Price.** In the event of changes in the outstanding Common Stock by reason of stock dividends, split-ups, recapitalizations, reclassifications, combinations or exchanges of shares, separations, reorganizations, liquidations, or the like, the number and class of shares available under the Warrant in the aggregate and the Exercise Price shall be correspondingly adjusted to give the Holder of the Warrant, on exercise for the same aggregate Exercise Price, the total number, class, and kind of shares as the Holder would have owned had the Warrant been exercised prior to the event and had the Holder continued to hold such shares until after the event requiring adjustment. The form of this Warrant need not be changed because of any adjustment in the number of Warrant Shares subject to this Warrant. Prompt notice of any adjustment made pursuant to this **Section 3(h)** shall be given to the Holder.

(i) **Combination.** While this Warrant is outstanding, in the event of a Combination (as defined below), each Holder shall have the right to receive upon exercise of the Warrant the kind and amount of shares of capital stock or other securities or property which such Holder would have been entitled to receive upon or as a result of such Combination had such Warrant been exercised immediately prior to such event (subject to further adjustment in accordance with the terms hereof). In the event of a Combination in which the Company is not the surviving entity, the Company shall provide that the surviving or acquiring Person (the "Successor Company") in such Combination will assume by written instrument the obligations under this Section 3(i) and the obligations to deliver to the Holder such shares of stock, securities or assets as, in accordance with the foregoing provisions, the Holder may be entitled to acquire. "Combination" means an event in which the Company consolidates with, merges with or into, or sells all or substantially all of its assets to another Person, where "Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

(j) **Market Stand-Off**. Holder shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale in relation to, any Common Stock (or other securities) of the Company held by Holder, for a period of time specified by the managing underwriter(s) (not to exceed one hundred eighty (180) days following the effective date of a registration statement of the Company filed under the Securities Act. Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriter(s) which are consistent with the foregoing or which are necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to such Common Stock (or other securities) until the end of such period. As a pre-condition

to any proposed transfer of this Warrant or any Common Stock issued hereunder, any proposed transferee of the Holder (or any subsequent transferee of this Warrant or any such shares of Common Stock) will be required to agree to the terms of this **Section 3(i)** and the Company may refuse to recognize or register and purported transfer that is not made in compliance with the terms hereof. 4. Transfer of Warrant. This Warrant shall not be transferred (in whole or in part) without the prior written consent of the Company, which consent shall not be unreasonably withheld.

5. Holder Not Deemed a Stockholder; Limitations on Liability. Except as otherwise specifically provided herein, prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose by virtue of being the Holder of this Warrant alone, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

6. Replacement on Loss; Division and Combination.

(a) **Replacement of Warrant on Loss**. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and upon delivery of an indemnity reasonably satisfactory to the Company and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company, at the Holder's expense, shall execute and deliver to the Holder, in lieu hereof, a new Warrant of like tenor and exercisable for the same number of Warrant Shares as the Warrant so lost, stolen, mutilated or destroyed; provided, that, in the case of mutilation, no indemnity shall be required if this Warrant in identifiable form is surrendered to the Company for cancellation.

(b) **Division and Combination of Warrant**. Subject to compliance with the applicable provisions of this Warrant as to any transfer or other assignment which may be involved in such division or combination, this Warrant may be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive offices, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the respective Holders or their agents or attorneys. Subject to compliance

with the applicable provisions of this Warrant as to any transfer or assignment which may be involved in such division or combination, the Company shall, at the Company's expense, execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants so surrendered in accordance with such notice. Such new Warrant or Warrants shall be of like tenor to the surrendered Warrant or Warrants and shall be exercisable in the aggregate for the same number of Warrant Shares as the Warrant or Warrants so surrendered in accordance with such notice.

7. Warrant Register. The Company shall keep and properly maintain at its principal executive offices books for the registration of the Warrant and any transfers thereof. The Company may deem and treat the Person in whose name the Warrant is registered on such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination or other transfer of the Warrant effected in accordance with the provisions of this Warrant.

8. Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing.

9. Cumulative Remedies. The rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity or otherwise.

10. Equitable Relief. Each of the Company and the Holder acknowledges that a breach or threatened breach by such party of any of its obligations under this Warrant would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction.

11. Entire Agreement. This Warrant constitutes the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Warrant and the Subscription Agreement, the statements in the body of this Warrant shall control.

12. Successor and Assigns. This Warrant and the rights evidenced hereby shall be binding upon and shall inure to the benefit of the parties hereto and the successors of the Company and the successors and permitted assigns of the Holder. Such successors and/or permitted

assigns of the Holder shall be deemed to be a Holder for all purposes hereunder.

13. No Third-Party Beneficiaries. This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Warrant.

14. Headings. The headings in this Warrant are for reference only and shall not affect the interpretation of this Warrant.

15. Amendment and Modification; Waiver. Except as otherwise provided herein, this Warrant may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

16. Severability. If any term or provision of this Warrant is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Warrant or invalidate or render unenforceable such term or provision in any other jurisdiction.

17. Governing Law. This Warrant shall be governed by and construed in accordance with the internal laws of the State of Delaware USA without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware USA or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware USA.

18. Submission to Jurisdiction. Any legal suit, action or proceeding arising out of or based upon this Warrant or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Delaware in each case located in the city of Wilmington, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by certified or registered mail to such party's address

set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

19. Waiver of Jury Trial. Each party acknowledges and agrees that any controversy which may arise under this Warrant is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Warrant or the transactions contemplated hereby.

20. No Strict Construction. This Warrant shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

[Signature appears on following page.]

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Original
Issue Date.

STREAM TV NETWORKS, INC.

By: _____
Name: Raja Rajan
Title: Chief Operating Officer

# EXHIBIT A

## FORM OF EXERCISE AGREEMENT

**TO: STREAM TV NETWORKS, INC.**

**ATTENTION:**
**LEGAL**

(1) The undersigned hereby elects to purchase _____ shares of the Common Stock of Stream TV Networks, Inc. (the "**Company**") pursuant to the terms of the attached Warrant, and tenders herewith payment of the Exercise Price in full, together with all applicable transfer taxes, if any.

- OR -

The undersigned hereby elects to purchase _____ shares of the Common Stock of the Company pursuant to the terms of the net exercise provisions set forth in **Section 3(b)(ii)** of the attached Warrant, and shall tender payment of all applicable transfer taxes, if any.

(2) Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned or in such other name as is specified below:

_____

(Name)

_____

_____

(Address)

(3) The undersigned represents that (i) the aforesaid shares of Common Stock are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such shares; (ii) the undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision regarding its investment in the Company; (iii) the undersigned is experienced in making investments of this type and has such knowledge and background in financial and business matters that the undersigned is capable of evaluating the merits and risks of this investment and protecting the undersigned's own interests; (iv) the undersigned understands that the shares of Common Stock issuable upon exercise of this Warrant have not been registered under

the Securities Act of 1933, as amended (the "**Securities Act**"), by reason of a specific exemption from the registration provisions of the Securities Act, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein, and, because such securities have not been registered under the Securities Act, they must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available; (v) the undersigned is aware that the aforesaid shares of Common Stock may not be sold pursuant to Rule 144 adopted under the Securities Act unless certain conditions are met and until the undersigned has held the shares for the number of years prescribed by Rule 144, that among the conditions for use of the Rule is the availability of current information to the public about the Company and the Company has not made such information available and has no present plans to do so; and (vi) the undersigned agrees not to make any disposition of all or any part of the aforesaid shares of Common Stock unless and until there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement, or the undersigned has provided the Company with an opinion of counsel satisfactory to the Company, stating that such registration is not required.

(Date) (Signature)

(Print name)

Exhibit B

(Standard Products)

**Exhibit B**


**(Standard Products)**



# 65" 8KL 16 Million Pixel
## Landscape Mode Ultra-D Display



We think the final customer will want these specs once they make it as final goods for the commercial industry.

| Feature | Description |
|---|---|
| Panel Features: 2D mode*<br><br>*From 2D Panel Spec | • 65" 16 Million Pixel TFT LCD with LED Backlight<br>• Landscape Mode Display<br>• Supports 4320 x 3840@60Hz<br>• Displays up to 10-bit 1.07 Billion Colors<br>• High Brightness up to 500cd/m2<br>• Ultra-High contrast ratio (4000:1) |
| Panel Features: 3D mode | • Proprietary Ultra-D 3D Optical System delivers a Seamless Viewing Experience<br>• Proprietary Rendering Module delivers Ultra-D converted content up to 3D Full UHD with High Brightness up to 350 nits<br>• Real Time Conversion technology enables playback of legacy content to Glasses Free 3D<br>• Horizontal 3D Viewing Angle: 90°<br>• Vertical 3D Viewing Angle: 40°<br>• User Adjustable Depth Control<br>• Software Switchable 2D/3D<br>• Optimum viewing distance 3 – 5 Meters |
| HDMI Input<br>Resolutions, Framerates and Formats | • HDMI 1.4 and 2.1 Compatible<br>• HDCP 1.4 and 2.1 Support<br>• 480p60, 576p50, 720p50, 720p60, 720p60 3DFP, 1080p24, 1080p60, 1080p24 3DFP, 480i60, 576i50, 1080i50, 1080i60, 4K30, 4K60, 8K60<br>• Supports 2D & 3D Stereo (Top/Bottom & Side by Side & Frame Packed) |
| Wireless Connectivity | • Wi-Fi 802.11ac, BT to Support NFC, RS232 |
| Real Time Video Conversion (Via HDMI) | • Manually configurable for 2D-as-2D, 2D to Ultra-D, and 3D Stereo to Ultra-D (Top/Bottom & Side by Side)<br>• Automatic detection of 3D S/S Frame Packed |
| Content Playback | • HDMI, USB, LAN or WiFi |
| Event Logging | • Playlist status<br>• Software update status<br>• Monitor/Display Status |
| Remote Control | • IR Based |
| User interface | • On Screen Key Guide |
| Software Update | • Software update via USB, Ethernet or Wi-Fi |
| I/O | • 2X USB, 3X HDMI 1.4a/2.1,<br>• 1X RJ45, RS232, 1X 3.5mm **Stereo** Audio O/P |
| Status Indicators | • Power Off/On/Sleep/Standby LED |
| Device Interactive Support | • CEC, Ethernet Control & Communications, RS232 Control |
| Region Allocation: | • China, NA, SA, EU, India, Mid East |
| Power Requirements | • 110~240V, Sleep Mode, Standby Mode |
| Other | • RoHs compliant |
| Certifications | • UL, C-UL, FCC, CE, CCC |
| Warranty | • 1-year commercial warranty |
| Display Dimensions/Wt. | • TBD |

{00843765.DOCX 1}65" 8KL Digital Signage Specification Sheet
Subject to Change

Thursday, June 13, 2019

Version 1

26

## Specifications [c]

| Feature | Description |
|---|---|
| Panel Features: 2D mode* <br> *From 2D Panel Spec | • Color Active Matrix TFT Module <br> • 4K (H:3840 x V:2160) 15.6" Display <br> • Component Depth: 8-Bit 16.7M Colors <br> • Pixel Arrangement: RGB Vertical Stripe <br> • Pixel Density:285 PPI <br> • Contrast Ratio: 1000:1 <br> • Brightness: 300 nit |
| Ultra-D™ Module Features [a] | • Proprietary Ultra-D™ Glasses Free 3D Optical Stack <br> • Proprietary Ultra-D™ Glasses Free 3D Rendering <br> • Horizontal 3D Viewing Angle: 120° <br> • Vertical 3D Viewing Angle: 40° <br> • Optimum viewing distance 35mm to 42mm |
| Viewing Orientation | • Ultra-D™: Horizontal <br> • 2D Horizontal |
| Module Thickness | • |
| Module Input | • VESA eDP Interface |
| Module Power Draw | • ASIC: <br> • IP: |
| Region Allocation: | • |
| Certifications | • |
| Module Dimensions/Wt. | • |

(a) Ultra-D™ Feature
(b) Optional Ultra-D™ Feature
(c) Subject to Change



15.6" Ultra-D™ Glasses-Free 3D Display Module Brief

---

General Description:

The 15.6" Ultra-D™ Glasses-Free 3D Display Module incorporates a 15.6" 4K TFT Panel integrated with Stream TV Networks Ultra-D™ 3D Optical Stack and Proprietary Ultra-D™ 3D Rendering technology.

**Target Use Cases**
- Consumer Gaming Entertainment Product such as a Laptop or Mini PC
- Commercial Digital Signage Display for Kiosk or a Small Footprint Requirement

**Optimal Viewing**
- 35cm – 42cm

**Deliverable Implementations** [c]
- Optics & IP
  Optics: Display panel with StreamTV™ proprietary lens
  IP: TSMC (10 or 7 nm), or Hard Macro

