**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| REMBRANDT 3D HOLDING LTD., Plaintiff, v. TECHNOVATIVE MEDIA, INC., HAWK INVESTMENT HOLDINGS LTD., AND SEECUBIC, INC., Defendants. | ) | C.A. No. 23-193-JLH **JURY TRIAL DEMANDED** |

**SEALED EXHIBIT A TO PLAINTIFF'S LETTER REGARDING DISCOVERY DISPUTE (DI 138)**

**AMBURN LAW, PC**

*/s/ David Holloway*
David Holloway (#5762)
Dean Amburn (#7295)
1504 N. Broom St., Suite 1
Wilmington, DE 19806
(302) 285-9485
*Attorneys for Plaintiff Rembrandt 3D Holding Ltd.*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| REMBRANDT 3D HOLDING LTD,<br>Plaintiff,<br>v.<br>TECHNOVATIVE MEDIA, INC., HAWK INVESTMENT HOLDINGS LTD., AND SEECUBIC, INC.,<br>Defendants. | C.A. No. 23-193-JLH-SRF |

**DEFENDANT SEECUBIC, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 1-6)**

Pursuant to Federal Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of this Court, Defendant SeeCubic, Inc. ("Defendant" or "SeeCubic"), by and through its undersigned counsel, provides these objections and responses to Plaintiff Rembrandt 3D Holding Ltd's ("Plaintiff" or "Rembrandt") First Set of Interrogatories to Defendant (No. 1-6).

Defendant's discovery and investigation in connection with this case are continuing. Thus, the Responses contained herein are based only upon the information presently available and known to Defendant. Defendant reserves the right to modify, amend, revise, correct, supplement, add to or clarify its Responses as the case develops and if and when Defendant discovers any additional relevant and responsive information.

**GENERAL OBJECTIONS**

1. Defendant objects to the Interrogatories and any Instructions relating thereto to the extent they purport to impose any burdens inconsistent with or in addition to Defendant's obligations under the applicable rules, including the Federal Rules of Civil Procedure, the Local Rules for the District Court of Delaware, the Court's Scheduling Order, or any other rules or orders

of this Court. By responding herein, Defendant does not waive its right to object to or refuse to answer any discovery request not specifically provided for by the applicable rules.

2. Defendant objects to each Interrogatory to the extent it seeks information that is protected from disclosure by the attorney-client privilege, work product doctrine, common-interest privilege, and/or any other applicable privilege or immunity. To the extent that the Interrogatories may be construed as seeking documents or things containing such privileged or protected information, Defendant hereby claims such privilege and invoke such protection. The fact that Defendant does not specifically object to an individual Interrogatory on the ground that it seeks such privileged or protected information shall not be deemed a waiver of the protection afforded by the attorney-client privilege, work product doctrine, common-interest privilege, or any other applicable privilege or protection. Inadvertent production of such information shall not constitute a waiver of any applicable privilege or protection.

3. Defendant objects to each Interrogatory to the extent it calls for the production of information, documents, or things not in Defendant's possession, custody, or control and/or not obtainable by means of a reasonably diligent search.

4. Defendant objects to each Interrogatory to the extent it seeks disclosure of any information that may comprise confidential or proprietary information or trade secrets. To the extent any of the Interrogatories call for Defendant's confidential or proprietary information, Defendant will produce such information pursuant to the Protective Order entered in this case.

5. Defendant objects to each Interrogatory to the extent it requires Defendant to produce information in violation of a legal or contractual obligation of nondisclosure or confidentiality to a third party. Defendant will produce such information if and when they obtain the necessary approvals.

6. Defendant objects to each Interrogatory to the extent it seeks information that is already in Plaintiff's possession or available from a public source.

7. Defendant objects to each Interrogatory to the extent it is overly broad, unduly burdensome, irrelevant, not proportional to the needs of this case, beyond the scope of permissible discovery, and/or are propounded for the purpose of harassment.

8. Defendant objects to each Interrogatory to the extent it is duplicative or cumulative of another Interrogatory.

9. Defendant objects to each Interrogatory to the extent it is not limited with respect to time. Defendant also objects to each Interrogatory to the extent it goes beyond the temporal scope of permitted discovery.

10. Defendant objects to each Interrogatory to the extent it uses terms that are ambiguous, vague, undefined, unclear, confusing, or subject to multiple possible definitions.

11. Defendant objects to the Interrogatories, and the instructions and definitions that accompany them, to the extent that they prematurely relate to or require expert testimony.

12. Defendant objects to the definition of "Defendant" or "SeeCubic" as vague, ambiguous, overly broad, and unduly burdensome to the extent that it purports to include separate and distinct legal entities and persons and to the extent that it further encompasses "any other person or entity acting in whole or in part in concert with any of the foregoing, directly or indirectly, including but not limited to, Shadron Stastney and the Team." Unless otherwise specified in a particular Response, SeeCubic will interpret "Defendant," and "SeeCubic" to mean and be limited to SeeCubic, Inc.

13. Defendant objects to each Interrogatory to the extent it uses terms that are ambiguous, vague, undefined, unclear, confusing, or subject to multiple possible definitions.

14. Defendant objects to the Interrogatories, and the instructions and definitions that accompany them, to the extent that they prematurely relate to or require expert testimony.

15. Defendant objects to the definition of "Person" as overly broad and unduly burdensome to the extent it seeks to cover non-parties and those outside of Defendant's control. Defendant will provide information as it exists within the knowledge of its employees and within its business record.

16. Each and every General Objection shall be deemed to be incorporated in full into each of the specific Responses set forth below.

17. Defendant gives the following objections and responses without waiving its right to produce evidence at trial, or in any other proceeding in this action, of any subsequently-ascertained facts. Defendant provides these objections and responses without admitting or waiving objections to the materiality, relevance, or admissibility in evidence of the matters set forth.

## SPECIFIC OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Describe in detail referencing by number within the Trade Secret Disclosure all information regarding whether each listed trade secret has been published or is otherwise publicly known and provide the source for such information and date such information became public.

**RESPONSE:**

In addition to its General Objections, Defendant objects to this Interrogatory on the grounds that it is unduly burdensome to the extent that it is impossible for Defendant to provide a full response. More specifically, Defendant's counsel is currently prohibited from showing the Trade Secret Disclosure to SeeCubic's Chief Executive Officer Mr. Shadron Stastney (D.I. 75) and therefore, cannot respond to this Request until the Court rules on Defendant's Objections to Magistrate Judge Fallon's Oral Order dated November 13, 2024 (D.I. 78). Defendant incorporates by reference the arguments made in Defendants' filings regarding Defendant's Request to Permit Chief Executive Officer Access to Plaintiff's Disclosure of Trade Secrets (D.I. 71 and 78). Defendant also objects to this Request as premature to the extent that it is seeking expert discovery before the date such discovery is due per the Scheduling Order.

Subject to the foregoing general and specific objections, Defendant respond as follows:

Rembrandt asserts that all 175 of the purported trade secrets contained in its Trade Secret Disclosures were generally described in the Term Sheet attached to the Complaint. (*See, e.g.*, Rembrandt's Response to Interrogatory No. 1). The three general categories of trade secrets were publicly disclosed in a 2012 Dutch patent application and a 2017 U.S. patent application. Indeed, Rembrandt previously asserted that the two patent applications purportedly "disclosed [Blumenthal's] Confidential Information," including "the border-blending and depth smoothing functions or features" described in the Term Sheet. (D.I. 1, Ex. 1, ¶114).

For instance, the first identified category of purported trade secrets in the Term Sheet of "efficiently converting, correcting and optimizing a 2d+ Depth video for playback on a 3D autostereoscopic associated with the Philip technology" is described in U.S. Patent No. 9,512,390 at Column 12, lines 16-26:

> Accordingly, the inventive techniques close the loop, and allow the use of a conventional 3DVC server to convert 2D content media not only to a 2D+ Depth format, utilizing one or more DBIR techniques, but to also automatically convert 2D content into highly desirable and commercially viable stereoscopic 3D medial content that is necessary for all 3D glasses-based display systems, large and small, thereby enabling a highly attractive and cost effective solution to be offered during the inevitable transition between 3D glasses-based display systems to ASD systems.

The second category in the Term Sheet—"utilizing the Philips 2d Switchable Lens Case technology for refractive and defractive [sic] lens switching for the creation of a 'lightfield' and 3d content artefact correction"—appears to be the same technology that Roelen allegedly disclosed to Stream, and in turn made public in patent applications and products sold to the public:

- During an October 8, 2010 meeting with Stream, Blumenthal allegedly "explained how the lens design for the 3DASD monitors was critical to matching the content to, and went over the 2d switchable technology," which allegedly caused Rajan to ask "Now I can do what you do. What do I need you for?" (SDNY, ¶68). Blumenthal later alleged that Stream did indeed steal and publicly disclose his alleged confidential technology. (D.I. 1, Ex. 22, ¶¶44 (Stream "attempt[ed] to patent my technology as their own")).

- Blumenthal allegedly developed "lens design aspects of the 3D lenticular lens, which Blumenthal had been working on with Corning . . . which were believed to be essential to the proper implementation of the product." (SDNY, ¶94). Blumenthal had a September 3 meeting with Corning and Roelen, an "objective" of which "was to share 3DFusion Intellectual Property and Trade Secret concepts with Corning and to explore Corning's ability to make certain improvements in the 2D switchable lens design and manufacturing. During the course of this meeting Blumenthal and Corning disclosed substantial Confidential Information to Roelen." (Id., ¶97). Rembrandt alleges that "subsequent to this meeting with Corning Glass, Roelen in violation of his agreement with and/or obligations owed to 3DFusion disclosed the Confidential Information to Stream who then

> utilized and/or incorporated the Confidential Information in their products and technology." (Id., ¶98). Roelen also "had subsequent meetings [with Corning] to discuss this technology after he terminated his employment . . . in violation of the NDAs that Roelen was subject to." (Id., ¶101).

The third category in the term sheet—"using the On Screen Display function of Borders and 'Liveliness'"—appears to be the same technology Rembrandt alleges Roelen published in a patent application. As Blumenthal claims in one of his declarations (D.I. 1, Ex. 22, ¶33):

> I also learned in or about 2017 that Roelen and Barenbrug filed a US patent application (Ser. No. 14/428,866) entitled 'Depth Adjustment of an Image Overlay in a 3D Image' on March 17, 2015 claiming priority to a Dutch patent application (Ser. No. 2009616) with a filing date of Oct. 11, 2012, which applications disclose the Confidential Information in violation of their NDAs such as, for example, the border-blending and depth smoothing functions or features described in a least paragraphs [0076], [0077], [0081], and [0082] of the 14/428,866 application.

In addition, Rembrandt admits in its Complaint that some of its purported trade secrets were publicly disclosed in Blumenthal's patents. (*See* D.I. 1, ¶50 ("Blumenthal's ***patented*** 'adjustability' solution cured the flawed half a billion dollar technology and made it a marketable product"); ¶54 ("The 3DFusion ***patent filing*** . . . provided the 'adjustability' key, whose essential foundation components opened the door for all future advancements")).

In addition, the purported trade secrets were previously disclosed by Philips, including in white papers, articles, patents, and patent applications. *See, e.g.*, EP2153669B1 (disclosing, among other things, "disparity map tuning" which is equivalent to "depth range tuning"); WO 2009/034519 (disclosing, among other things, how a user is provided a GUI to tune the range of values in a depth map); US 2011/0199465 A1 (disclosing, among other things, depth range tuning); WO 2010/052632 (disclosing, among other things, depth range tuning).

Rembrandt also disclosed its secrets to others without adequate confidentiality protections, including 3D Fusion's "lender," DreamWorks, Sony, Intel, Technicolor, Pixar, and IZON TV. (D.I. 1, Ex. 22, ¶¶27, 36; D.I. 1, Ex. 1, ¶119).

Rembrandt also asserts that it disclosed confidential information to Roelen, who, in alleged violation of his NDA, inappropriately disclosed the information to Stream who in turn incorporated "the Confidential Information in their products and technology." (D.I. 1, Ex. 1, ¶¶97-98). At the time these purported trade secrets were disclosed to Stream, Stream did not have an NDA with Rembrandt or any of its purported predecessors-in-interest.

Lastly, according to its RFP responses, Rembrandt claims that it generated its list of 175 trade secrets by reviewing documents falling into the seven categories below which have the corresponding dates:

| **Category of Document** | **Date or Date Range** |
|---|---|
| Meeting minutes between the Team and Mr. Blumenthal | January 2010 to June 2010 |
| Emails from Team member Bart Barenbrug | August 2009 to December 2010 |
| Skype messages from Team member Bart Barenbrug | December 2009 to February 2011 |
| Skype messages from Team member Grazina Seskeviciute | October 2009 to February 2011 |
| Emails from Team member Hans Zuidema | February 2010 to February 2011 |
| A paper entitled "Fuzer" authored by Bart Barenbrug | February 14, 2010 |
| A paper entitled "Post Production Setup" authored by Bart Barenbrug | April 27, 2010 |

Importantly, all 175 identified trade secrets come from either the Team's communications with Mr. Blumenthal or documents authored by the Team, meaning that Rembrandt does not have any documentary evidence that Mr. Blumenthal independently conceived of any of the trade secrets.

Moreover, **Exhibit A** hereto, which is a chart cross-referencing a sampling of the 175 trade secrets with statements made by Team members in the documents Rembrandt identified, demonstrates that the ideas behind these purported trade secrets came from the Team, not Mr. Blumenthal. Indeed, using the documentary evidence produced by Rembrandt, it does not appear that any trade secret was derived from a technical disclosure made by Mr. Blumenthal.

Additionally, as shown above, most of these communications and documents predate October 4-12 of 2010—when the NDAs between the Team and Mr. Blumenthal were signed. While Rembrandt claims that the Team "orally agreed to keep 3DFusion's proprietary technology confidential" (D.I. 1, Ex. 1, ¶ 37), Rembrandt has produced no documentary evidence of such an oral agreement. Indeed, when Rembrandt was asked to provide "all documents evidencing or otherwise concerning the [alleged] oral agreement between 3DFusion and Roelen/Barenbrug" in RFP 31, Rembrandt simply pointed to the NDAs they signed in October 2010 (which are not retroactive and say nothing about an oral agreement), and the same meeting minutes and communications with the Team identified above that were the source of Rembrandt's 175 trade secrets. None of these mention such an oral agreement. Indeed, as of April 21, 2010 (months after Mr. Blumenthal and the Team began discussions), the meeting minutes identified by Rembrandt task Mr. Blumenthal with sending the NDA to the Team members and notes that "[s]till no NDA received from SteveB," indicating that the failure to get the NDAs timely signed was Mr. Blumenthal's. Any information disclosed between 3DF/Mr. Blumenthal and the Team prior to October 12, 2010 (the date the NDAs were countersigned by Mr. Blumenthal) is not protected and thus, not entitled to trade secret status.

The same goes for any information that was disclosed between 3DF/Mr. Blumenthal and the Team after the NDAs were signed on October 12, 2010 and before the Team terminated the NDAs in January-March 2011. This is because, per paragraph 4 of the NDAs, this information only needs to be kept confidential "for a period of five (5) years from the date of each such disclosure," and thus the information could be freely shared (and thus would not be a trade secret) as of 2016.

In its Complaint, Rembrandt focuses on the NDA it signed with Stream in June 2010, which

unlike the NDAs the Team signed, states that all improvements to the technology would allegedly be "owned by 3DFusion" (D.I. 1, ¶ 64). Although the Team members later worked for Stream after their NDAs were terminated in March 2011, the Stream NDA does not protect or assign any of the technology the Team and 3DF disclosed to each other between August 2009 and March 2011. Moreover, Rembrandt admits that 3DF "never received any signed employment agreement from the Team" (D.I. 1, Ex. 1, ¶ 79), and Rembrandt has not produced any document assigning concepts the Team developed to 3DF.

Discovery is ongoing and Defendant reserves the right to supplement this response, including **(1)** when the Court rules on Defendant's Objections (D.I. 78), or **(2)** during expert discovery per the Court's Scheduling Order.

**INTERROGATORY NO. 2:**

Describe in detail each contract or business expectation Defendant alleges that Rembrandt interfered with including the names and contact information for all parties involved in such contract or business expectation, the value of such contract or business expectation and exactly how Rembrandt interfered with such contract or business expectation and when Rembrandt knew of such contract or business expectation.

**RESPONSE:**

In addition to its General Objections, Defendant objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome and not proportional to the needs of this action. Defendant further objects to this Interrogatory to the extent that it seeks information not within Defendant's possession, custody, or control. Defendant also objects to the Interrogatory to the extent that it seeks information already known to Plaintiff or otherwise publicly available.

Subject to the foregoing general and specific objections, Defendant responds as follows: Shortly after SeeCubic was formed in 2020, and after years of litigating with Stream TV Networks Inc. ("Stream"), Rembrandt concocted a scheme to prevent SeeCubic from recouping at least $37

million in investments in, and loans made to, Stream's subsidiaries Ultra-D Coöperatief U.A., SeeCubic BV, and Stream TV International B.V.

During Stream's first bankruptcy proceeding, on April 20, 2021, the Chief Financial Officer of Rembrandt and its Delaware subsidiary, Rembrandt 3D Corp., Christopher Michaels, sent emails to counsel for Stream and its creditors. (D.I. 1 at Ex. 19-20 ("April 20 Correspondence")); *In re: Stream TV Networks, Inc.*, No. 23-10763-mdc, D.I. 325 (Bankr. E.D. Pa.). In Mr. Michaels's April 20 Correspondence, Rembrandt made clear that it intended to block any transfer of assets to SeeCubic. Rembrandt also threatened Stream and its creditors to make sure they fell in line, stating that "Rembrandt has the wherewithal to block any transfer of IP assets to either party, precluding any investor based business." (D.I. 1 at Ex. 19-20 at 3.) Rembrandt announced its plan to Stream and other creditors of Stream as follows:

> Ironically, if Stream TV performs its agreement with Rembrandt, Stream TV would have a license ***and be in a position to claim that the Rembrandt license is worth hundreds of millions of dollars such that Stream TV should be allowed to file a reorganization plan to allow it to proceed under license from Rembrandt to pay off the creditors.***
>
> We certainly contend that our IP rights are worth far more than Stream TV's liabilities and were clearly not transferred to SeeCubic in the Delaware action, ***so it seems that about the only asset Stream TV would have to oppose SeeCubic's motion to dismiss is to argue that it has a license from Rembrandt that dominates the assets that would be transferred to SeeCubic and that Stream TV has a going concern value based on the value of the licensing rights purchased from Rembrandt.***

*Id.* (emphasis added). At the time of this correspondence, Rembrandt was aware of Stream's indebtedness to SeeCubic.

After the Delaware Bankruptcy Court determined that Stream's first bankruptcy

proceeding was filed bad faith, Stream then took Rembrandt up on its previously offered plan to keep assets away from SeeCubic. On May 23, 2021, Rembrandt, Stream, and the Rajans entered into the Final Settlement Agreement. (D.I. 1, Ex. 2.) Upon information and belief, when Rembrandt signed the Final Settlement Agreement, it knew that Stream had no ability to perform the terms of that agreement. Section 22 of the Final Settlement Agreement states that "[t]his Agreement shall be binding on, and shall be enforceable against, and shall inure the benefit of the Parties to this Agreement and their respective [ ] subsidiaries." (D.I. 1, Ex. 2 at § 22.) In other words, the Final Settlement Agreement purports to grant Stream's subsidiaries, including SCBV, a license commensurate in scope with Stream's purported license.

That same day, Stream filed a second petition for bankruptcy. *In re: Stream TV Networks, Inc.*, No. 21-10848-KBO, D.I. 1 at 3 (Bankr. D. Del.). In its petition, Stream included the Final Settlement Agreement with Rembrandt as a debt, with a claim amount of $1,528,000 (almost a hundred times less than the $1.2-1.5 billion that Rembrandt later threatened SeeCubic and its business partners with). The Delaware Bankruptcy Court dismissed the second bankruptcy action with prejudice, determining that the action was "another attempt by the parties to circumvent [the Court's prior] dismissal order, gain some sort of litigation leverage over the secured lenders and the disputes in the Chancery Court, and essentially get another bite of the appl[e]." *Id.* at D.I. 37 at 63:25-64:3, 65:2-6 (TRANSCRIPT).

On March 15, 2023, Stream filed its third petition for bankruptcy in the United States District Court for the Eastern District of Pennsylvania. *In re: Stream TV Networks, Inc.*, No. 23-10763-mdc (Bankr. E.D. Pa.). In those proceedings, SeeCubic has filed a claim in the amount of "no less than" $37 million for its investment in, and loans made to, SCBV.

Rembrandt and Stream have since amended the Final Settlement Agreement. For instance,

in an August 14, 2023 email that Stream sent to an unknown distribution list, Stream noted that "Rembrandt 3D Holdings LTD, which owns certain underlying intellectual property contained in the Ultra-D™ technology, has expanded its license arrangement with Stream to prevent certain Stream competitors from entering the market. . . Rembrandt has agreed to permanently block its technology and withhold licenses from [among others]. . . SeeCubic, Inc., . . . Shadron Stastney . . . [and] [a]ny entity to which Shadron Stastney . . . [is] associated." (D.I. 27, Ex. A.)

On February 21, 2023—eleven years after Rembrandt admittedly became aware of Stream's misappropriation of its purported trade secrets—Rembrandt finally brings a trade secret misappropriation claim against SeeCubic, not Stream. Rembrandt did not have any protectable trade secrets regarding the technology at-issue in this case when it filed this action. Indeed, Rembrandt's claims are nothing more than another attempt to hinder SeeCubic's ability to obtain what is rightfully owed to it and impede SeeCubic's business by driving up litigation costs defending a meritless action.

Rembrandt continues to intentionally interfere, with SeeCubic's business relations causing great harm to SeeCubic. On June 29, 2023, in Dutch proceedings concerning the control over SCBV, the Dutch court appointed Jasper Berkenbosch ("Mr. Berkenbosch") of the law firm Jones Day as an independent director of SCBV pending resolution of Stream's third bankruptcy filing. Rembrandt, a non-party to the Dutch proceedings, saw yet another opportunity to prevent SeeCubic from recovering on debts owed to it.

On July 27, 2023, after learning that the independent director of SCBV was finalizing a contract with a confidential customer for the purchase of certain 3-D televisions, and despite knowing that SCBV's employees believed that "the IP which Rembrandt claims to have a patent on, is not used in this product," Rembrandt's CFO, Mr. Michaels, emailed Mr. Berkenbosch

demanding that SCBV not make any product "other than for Stream or Rembrandt" and that "all revenue from sales of any product or services that include Rembrandt IP go to the entity that is paying Rembrandt." (D.I. 27, Ex. B at 9.) He also misleadingly claimed that "Rembrandt has litigated its IP rights and claims in six different courts to date" and that Rembrandt's settlement with Stream resolving its contractual claims was a result of "litigating whether Rembrandt's trade secrets had been incorporated into Stream's products." (*Id.* at 8-9.)

On August 7, 2023, three days after this Court denied Rembrandt's Motion for Preliminary Injunction (D.I. 26), Rembrandt's CFO, Mr. Michaels, penned another email to Mr. Berkenbosch, taking an even more aggressive approach. In that email, Rembrandt lodged several threats to Mr. Berkenbosch and Jones Day in an apparent attempt to convince Mr. Berkenbosch to step down from the board. (D.I. 27, Ex. B at 4-7).

Rembrandt made these threats despite knowing that the Final Settlement Agreement between Stream and Rembrandt states that "[t]his Agreement shall be binding on, and shall be enforceable against, and shall inure the benefit of the Parties to this Agreement and their respective [ ] subsidiaries." (D.I. 1, Ex. 2 at § 22.) In other words, SCBV, as Stream's subsidiary, has a license commensurate in scope with the license that Stream purportedly has. Jones Day, on behalf of Mr. Berkenbosch, responded that same day, noting that SCBV employees were "urg[ing] the director to cooperate with delivery of the samples they have been working on over the last years." (D.I. 27, Ex. B at 3.) Despite these pleas, Mr. Michaels followed up his threats with inappropriate requests for discovery from Mr. Berkenbosch and Jones Day purportedly for the above-captioned matter without a valid subpoena or request made pursuant to the Hague Convention. (*Id.* at 1.) Ultimately, Rembrandt's threats worked to the great detriment of SeeCubic, as Mr. Berkenbosch subsequently resigned as SCBV's independent director.

In addition, Rembrandt interfered with SeeCubic's ability to collect on the Stream debt by bringing this baseless lawsuit.

Although SeeCubic BV has since changed ownership through the bankruptcy auction, Rembrandt still seeks to reverse the results of that auction, and still presses forward with its baseless claims against SeeCubic in this case. Rembrandt's actions have forced SeeCubic to spend millions of dollars in unnecessary attorney fees.

Discovery is ongoing and Defendant reserves the right to supplement this response.

**INTERROGATORY NO. 3:**

List all meetings with current or potential investors or current or potential customers, the dates and places of each meeting, the companies and individuals who attended, and what products or technology was shown at each meeting.

**RESPONSE:**

In addition to its General Objections, Defendant objects to this Interrogatory on the grounds that it: (a) is overly broad and unduly burdensome and not proportional to the needs of this action; and (b) calls for documents and information that is neither relevant to the subject matter involved in this action nor reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to this Interrogatory to the extent that it seeks information not within Defendant's possession, custody, or control. Defendant also objects to this Interrogatory as seeking information that is not relevant to any claim or defense in this case, especially to the extent it seeks information concerning "current or potential investors."

Subject to the foregoing general and specific objections, Defendant responds as follows: Pursuant to Federal Rule of Civil Procedure 33(d), Defendant will produce non-privileged, relevant, responsive documents in its possession, custody, and control concerning current or potential customers, but will not produce documents concerning "current or potential investors"

since that information is irrelevant to any claim or defense in this case.

**INTERROGATORY NO. 4:**

For each of the products or technology shown at the above meetings (INTERROGATORY 3), state everyone who was involved in creating the hardware or software and the dates of their involvement.

**RESPONSE:**

In addition to its General Objections, Defendant objects to this Interrogatory on the grounds that it: (a) is overly broad and unduly burdensome and not proportional to the needs of this action; and (b) calls for documents and information that is neither relevant to the subject matter involved in this action nor reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to this Interrogatory to the extent that it seeks information not within Defendant's possession, custody, or control. Defendant also objects to this Interrogatory as seeking information that is not relevant to any claim or defense in this case, especially to the extent it seeks information concerning "current or potential investors."

Subject to the foregoing general and specific objections, Defendant responds as follows: Pursuant to Federal Rule of Civil Procedure 33(d), Defendant will produce non-privileged, relevant, responsive documents in its possession, custody, and control concerning current or potential customers, but will not produce documents concerning "current or potential investors" since that information is irrelevant to any claim in this case.

**INTERROGATORY NO. 5:**

List all no glasses 3D displays owned, formerly owned, sold, offered for sale, imported, exported, or used by Defendant including the size of each display and when such display was in the possession of Defendant and when possession of such display was transferred to a third party and the name of such third party and further list all software and firmware modules included with each such Display.

**RESPONSE:**

In addition to its General Objections, Defendant objects to this Interrogatory on the grounds that it: (a) is overly broad and unduly burdensome and not proportional to the needs of this action; and (b) calls for documents and information that is neither relevant to the subject matter involved in this action nor reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to this Interrogatory to the extent that it seeks information not within Defendant's possession, custody, or control.

Subject to the foregoing general and specific objections, Defendant responds as follows: Pursuant to Federal Rule of Civil Procedure 33(d), Defendant will produce non-privileged, relevant, responsive documents in its possession, custody, and control concerning the information sought in this Interrogatory.

**INTERROGATORY NO. 6:**

Describe in detail all negotiations for the licensing of technology by the Defendant including the companies, names of individuals involved in the negotiations, dates of phone calls and meetings, the license terms offered, and a description of the technology, hardware, and software included in the negotiations and offered license.

**RESPONSE:**

In addition to its General Objections, Defendant objects to this Interrogatory on the grounds that it: (a) is overly broad and unduly burdensome and not proportional to the needs of this action; and (b) calls for documents and information that is neither relevant to the subject matter involved in this action nor reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to this Interrogatory to the extent that it seeks information not within Defendant's possession, custody, or control.

Subject to the foregoing general and specific objections, Defendant responds as follows: Defendant has not conducted negotiations for the licensing of technology. SeeCubic BV has a

license from Philips.

GREENBERG TRAURIG, LLP

*/s/ Renée Mosley Delcollo*

Benjamin J. Schladweiler (#4601)
Lisa M. Zwally (#4328)
Renée Mosley Delcollo (#6442)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
(302) 661-7000
schladweilerb@gtlaw.com
lisa.zwally@gtlaw.com
renee.delcollo@gtlaw.com

*Attorneys for Defendant SeeCubic, Inc.*

DATED: June 5, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2025 true and correct copies of the foregoing document were caused to be served on the following counsel as indicated:

**VIA ELECTRONIC MAIL**
Andrew P. DeMarco
Devlin Law Firm LLC
1526 Gilpin Avenue
Wilmington, DE 19806
ademarco@devlinlawfirm.com

*Counsel for Plaintiff*

**VIA ELECTRONIC MAIL**
Christopher A. Michaels
BROWN & MICHAELS, PC
4th Floor, 118 N. Tioga St.
Ithaca, NY 14850
michaels@bpmlegal.com

*Counsel for Plaintiff*

**VIA ELECTRONIC MAIL**
Neil Wallace
3800 Oaks Clubhouse Dr., #206
Pompano Beach, FL 33064
ntwallace@aol.com

*Counsel for Plaintiff*

*/s/ Renée Mosley Delcollo*
Renée Mosley Delcollo (#6442)

# EXHIBIT A

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]