**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| REMBRANDT 3D HOLDING LTD., Plaintiff, | ) | C.A. No. 23-193-JLH-SRF |
| v. | ) | **PUBLIC VERSION** |
| SEECUBIC, INC., Defendant. | ) | |

**DEFENDANT AND COUNTERCLAIM PLAINTIFF SEECUBIC, INC.'S**
**OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:

Giancarlo Scaccia
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
212.801.6831
scacciag@gtlaw.com

GREENBERG TRAURIG, LLP

Benjamin J. Schladweiler (#4601)
Renée Mosley Delcollo (#6442)
222 Delaware Avenue, Ste. 1600
Wilmington, DE 19801
302.661.7000
schladweilerb@gtlaw.com
renee.delcollo@gtlaw.com

*Attorneys for Defendant SeeCubic, Inc..*

Dated: September 18, 2026

# TABLE OF CONTENTS


I. LEGAL STANDARD....................2

A. Summary Judgment....................2

B. Delaware Uniform Trade Secret Act....................3

II. UNDISPUTED MATERIAL FACTS....................3

A. Undisputed Facts Demonstrating No Protectable Trade Secrets....................3

B. Undisputed Facts Demonstrating Violation of Statute of Limitations....................6

III. ARGUMENT....................8

A. THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE REMBRANDT HAS NO PROTECTABLE TRADE SECRETS....................8

1. The Purported Trade Secrets Were Readily Ascertainable To SeeCubic By Proper Means....................8

2. The Purported Trade Secrets Were Not Subject to Reasonable Efforts to Maintain Their Secrecy....................11

B. REMBRANDT'S MISAPPROPRIATION CLAIMS ARE TIME-BARRED....................14

IV. CONCLUSION....................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*B&P Littleford, LLC v. Prescott Machinery, LLC*,
2021 WL 3732313 (6th Cir. Aug. 24, 2021) ..... 17

*Biohaven Therapeutics Ltd. v. Avilar Therapeutics, Inc.*,
No. CV 23-328-JLH-CJB, 2026 WL 2368110 (D. Del. July 14, 2026) ..... 8, 11

*Bletz v. Corrie*,
974 F.3d 306 (3d Cir. 2020) ..... 3

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..... 3

*H.T. v. A.E.*,
9 N.Y.S.3d 593 (N.Y. Sup. Ct. 2014) ..... 10

*Kehoe Component Sales Inc. v. Best Lighting Products, Inc.*,
796 F.3d 576 (6th Cir. 2015) ..... 17

*Long Island Minimally Invasive Surgery, P.C. v. MultiPlan, Inc.*,
228 A.D.3d 638 (N.Y. 2024) ..... 9

*Nova Chemicals, Inc. v. Sekisui Plastics Co.*,
579 F.3d 319 (3d Cir. 2009) ..... 11

*Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.*,
2019 WL 6726836 (Del. Super. Dec. 4, 2019), *aff'd,* 247 A.3d 674 (Del. 2021) ..... 3, 15, 17

*Raza v. Siemens Med. Sols. USA Inc.*,
607 F. Supp. 2d 689 (D. Del. 2009) ..... 16

*RoboticVISIONTech, Inc. v. ABB Inc.*,
726 F. Supp. 3d 364 (D. Del. 2024) ..... 15

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ..... 11

*Santini v. Fuentes*,
795 F.3d 410 (3d Cir. 2015) ..... 3

*Stream TV Networks, Inc. v. SeeCubic*,
250 A.3d 1016 (Del. Ch. 2020) ..... 6

*Structured Capital Solutions, LLC v. Commerzbank AG*,
177 F. Supp. 3d 816 (S.D.N.Y. 2016)....................10, 12

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
2005 WL 1089027 (Del. Ch. May 4, 2005)....................11

**Statutes**

6 *Del. C.* § 2001 ....................3, 8, 11, 17

6 *Del. C.* § 2006 ....................3, 14, 17

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................2

This trade secret misappropriation case fails at both ends. By the time Defendant SeeCubic, Inc. ("SeeCubic") even existed, the alleged trade secrets lost the secrecy necessary for protection. And by the time Plaintiff Rembrandt 3D Holding Ltd. ("Rembrandt") sued SeeCubic, the limitations period had expired years earlier. The undisputed record establishes both points.

***First***, Rembrandt cannot prove the existence of protectable trade secrets. Stephen Blumenthal, Rembrandt's founder and CEO, allegedly disclosed the purported trade secrets to Bart Barenbrug and his engineering team in Eindhoven, Netherlands ("the Team") while they were working with 3DFusion (Rembrandt's purported predecessor-in-interest) under written nondisclosure agreements that imposed confidentiality for a defined five-year period. Barenbrug and his Team terminated their NDAs in 2010-2011. Rembrandt's corporate representative and expert agree that the Team's confidentiality obligations expired in 2016. Rembrandt cannot convert that limited obligation into perpetual secrecy. Once the agreed confidentiality period ended, Barenbrug did not have a continuing duty to keep the information confidential. The information therefore was readily ascertainable by proper means and was no longer subject to reasonable efforts to preserve its secrecy. SeeCubic, a company not formed until 2020, could not have misappropriated trade secrets that had already lost their protected status years before it came into existence.

***Second***, Rembrandt's claims are time barred. Rembrandt admits that its founder and CEO, Stephen Blumenthal, believed by January 2012 that Barenbrug and other Team members were displaying technology belonging to 3DFusion while working for SeeCubic B.V. ("SCBV")—which at the time was a subsidiary of Stream TV Networks, Inc. ("Stream") and years later became an indirect subsidiary of SeeCubic. Rembrandt also admits that it received further notice in 2017, when it learned of a patent application that allegedly disclosed the confidential 3DFusion

information. Indeed, Rembrandt sued Stream that year and expressly alleged misuse of its confidential, proprietary, and trade secret information. Yet Rembrandt asserted no trade secret claim against Barenbrug or anyone else. Indeed, Rembrandt waited until 2023 to file its first trade secret misappropriation claim.

The Delaware Uniform Trade Secrets Act ("DUTSA") does not permit that delay. Its three-year limitations period begins when the alleged misappropriation is discovered or reasonably should have been discovered, and a continuing misappropriation constitutes a single claim. Rembrandt therefore cannot revive an expired claim by relabeling SeeCubic's later effort to acquire Stream's assets as a new misappropriation. The alleged secrets, the alleged original taking, and the individuals supposedly responsible are the same. Rembrandt's own expert confirms the point: although SeeCubic did not exist in 2010, he defines "SeeCubic" to include Dr. Barenbrug, SeeCubic B.V., Stream, and others, and opines that this supposed collective took the source code in November 2010. Rembrandt's theory thus locates the alleged wrong more than twelve years before this action was filed.

For the reasons herein, SeeCubic respectfully moves the Court for summary judgment on Counts III and IV.[1]

## I. LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

[1] Count III of the Complaint alleges trade secret misappropriation and Count IV seeks an injunction for that alleged misappropriation. Both Counts are brought against SeeCubic under the Delaware Uniform Trade Secrets Act. Counts I and II of the Complaint are against defendants who have been dismissed.

Civ. P. 56(a). "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party." *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020). To avoid summary judgment, the non-moving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, (1986) (quotations omitted); *see also Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015).

**B. Delaware Uniform Trade Secret Act**

Rembrandt brought this diversity action against SeeCubic pursuant to DUTSA. (D.I. 1, ¶¶10, 126). In order for information to be considered a trade secret under DUTSA, it must meet two independent criteria: the information must (a) "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and (b) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 6 *Del. C.* § 2001.

A claim for misappropriation under the DUTSA "must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered," and "a continuing misappropriation constitutes a single claim." 6 *Del. C.* § 2006. This means that each new use of an alleged trade secret does not reset the statute of limitations clock as all misappropriation is treated as a "single claim that accrues when the misappropriation reasonably could be discovered." *Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.*, 2019 WL 6726836, at *16 (Del. Super. Dec. 4, 2019), *aff'd,* 247 A.3d 674 (Del. 2021).

**II. UNDISPUTED MATERIAL FACTS**

**A. Undisputed Facts Demonstrating No Protectable Trade Secrets**

Rembrandt asserts that its purported trade secrets were developed by its CEO and founder, Stephen Blumenthal, between December 2009 and March 2011 while he and his company

3DFusion (Rembrandt's alleged predecessor-in-interest) were working with the Team in Eindhoven, Netherlands. (SeeCubic's Statement of Fact ("SOF") #1).[2] Bart Barenbrug, Walther Roelen, and Hans Zuidema were members of that Team. (D.I. 1-22, ¶11). Rembrandt asserts that the Team "orally agreed to keep 3DFusion's proprietary technology confidential" in various communications and meetings involving those parties between December 2009 and August 2010. (SOF #4). Blumenthal, Rembrandt's 30(b)(6) witness, testified "there was no confidential information relayed to any member of the [T]eam from [him] after 2011." (SOF #2).

In October 2010, the Team signed nondisclosure agreements ("NDAs") with 3DFusion. (SOF #5). Each NDA expressly provided, among other things, that:[3]

- the Team "shall keep Confidential Information of" 3DFusion "in confidence . . . for a period of five (5) years from the date of each disclosure of Confidential Information" and that this obligation "shall survive termination" (SOF #6); and
- "this Agreement constitutes the entire understanding between the parties hereto as to the Confidential Information and merges all prior discussions between them relating thereto" (SOF #7).

Each NDA also stated that "[n]o amendment or modification of this Agreement shall be valid or binding on the parties unless made in writing and signed by the parties respective duly authorized representatives." (SOF #8). There were no written amendments to the Team's NDAs. (SOF #9).

---

[2] Citations to SOF refer to Defendant and Counterclaim Plaintiff SeeCubic, Inc.'s Concise Statements of Facts in Support of its Motion for Summary Judgment filed contemporaneously herewith.

[3] Blumenthal testified that all the Team's NDAs were the same except for the additional language that was added to the NDAs of Messrs. Roelen and Zuidema, which is discussed below. (SOF #10).

The NDAs signed by two Team members, Messrs. Roelen and Zuidema, include a clause not found in the other NDAs. (SOF #10). Specifically, these NDAs state that they "will be terminated in the event no employment contract between the parties is signed in the year 2010." (*Id.*). Neither Roelen nor Zuidema received an employment contract from 3DFusion in 2010, and thus these NDAs terminated at the end of 2010. (SOF #11; D.I. 1, Ex. 1, ¶59 (alleging that 3DFusion "never received any signed employment agreement form the Team, and by the end of December 2010, the Team notified [3DFusion] that the Team will not execute the employment agreements")).

The remainder of the Team expressly terminated their NDAs in writing by March 2011. (SOF #12). For instance, in an email dated March 3, 2011, Barenbrug provided written notice that he was terminating his NDA. (SOF #13). In response to that email, Blumenthal stated that the NDAs were still "in effect for five years with regard to all trade secret and other information regarding our business which we shared with you." (*Id.*). Blumenthal made similar statements in response to the written terminations of other Team members. (SOF #14 ("On the NDA, the only element which is terminated is that any information given to you from this day forth is not covered by NDA. All previous information, trade secrets, IP ideas, etc. is covered for five years, and will be enforced.")).

Because Barenbrug's NDA was terminated on March 3, 2011, the confidentiality provisions in his NDA expired on March 3, 2016—five years later. (SOF #6). This date was confirmed by both Rembrandt's 30(b)(6) witness and expert. (SOF #15 (Blumenthal testifying that he told the Team in March 2011 that their "obligation to keep the information confidential expires on March 2016"); SOF #16 ("by my calculation, the [NDA] expiration occurred on March 3rd 2016")).

### B. Undisputed Facts Demonstrating Violation of Statute of Limitations

Shortly after terminating his NDA, Barenbrug and other members of the Team began working for SCBV, an Eindhoven, Netherlands company and subsidiary of Stream that was formed in 2011 and was owned by Stream until December 2020 and various times thereafter. (SOF #17); *Stream TV Networks, Inc. v. SeeCubic*, 250 A.3d 1016, 1047 (Del. Ch. 2020).

In the Complaint, Rembrandt alleges that "Eindhoven team employees, in violation of their NDAs and fiduciary duties, disclosed 3DFusion's technology, I.P. and trade secrets to Stream TV Networks." (SOF #18; D.I. 1, ¶67). According to Blumenthal's testimony under oath, he was put on notice of these claims as early as "January 2012" when he saw members of the Team representing themselves as Stream employees and exhibiting technology that allegedly "belonged to 3DFusion." (SOF #19; D.I. 1, Ex. 22, ¶32). He further testified that he was on notice in or about 2017, that "Roelen and Barenbrug filed a US patent application" that allegedly "disclose[d] the Confidential Information in violation of their NDAs such as, for example, the border-blending and depth smoothing functions." (SOF #20; D.I. 1, Ex. 22, ¶33).

In 2017, Rembrandt sued Stream (then SCBV's parent company) for, among other things, breach of contract in the Southern District of New York (the "SDNY Action") based on the NDA Stream signed with 3DFusion in June 2010 and not the NDAs signed by the individual Team members. (D.I. 1, Ex. 1, ¶¶55, 172-176). Although Rembrandt alleged in the SDNY Action that it was seeking to "preclude any further misuse of its confidential, proprietary, and trade secret information" (*id.*, ¶121), Rembrandt did not include SCBV as a defendant in that litigation and did not assert a claim for trade secret misappropriation against any of the defendants it did name, including Stream. (*See generally* D.I., Ex. 1).

The sole defendant in this action, SeeCubic, Inc., was formed as a Delaware corporation in May 2020. (SOF #23). In December 2020, SCBV went from being a subsidiary of Stream to an

indirect subsidiary of SeeCubic, Inc. and it remained that way until June 2022. (SOF #24). SCBV was again a Stream subsidiary from June 2022 to January 2025. SeeCubic, Inc. purchased Stream's assets in a bankruptcy sale in January 2025, including its SCBV assets. (SOF #25). SCBV has remained an indirect subsidiary of SeeCubic, Inc. ever since. (*Id*.)

Rembrandt filed this suit in February 2023 (D.I. 1), during the period when SCBV was a subsidiary of Stream. (SOF #25). This was the first time that Rembrandt, Blumenthal, or 3DFusion ever filed a trade secret misappropriation claim against anyone. (SOF #27). The Complaint alleged that many of the "events and agreements" discussed therein "were the basis for the [SDNY Action] in January 2017 against Stream, Mathu Rajan, and Raja Rajan." (D.I. 1, ¶69). In Count IV of the Complaint, Rembrandt sought an injunction preventing SeeCubic from obtaining Stream's assets, including SCBV. (*Id*., ¶¶124-128).

On April 12, 2023, Rembrandt moved for a preliminary injunction preventing SeeCubic from obtaining the assets of Stream, including SCBV. (D.I. 13). The Court denied that motion by oral order on August 4, 2023. (D.I. 20, 26).

Even though SeeCubic, Inc. was incorporated in 2020, Rembrandt's expert, Dr. Sears defined "SeeCubic" broadly as including Bart Barenbrug, SCBV, Stream, and others. (SOF #32). He then repeatedly used this broad definition to allege that "SeeCubic copied" source code "in 2010"—a decade before SeeCubic's existence. (SOF #33 ("While establishing SeeCubic, Bart Barenbrug was working with 3DFusion on projects that matched his work at SeeCubic, and copied code from 3DFusion to SeeCubic" and allegedly "did so while under NDA"—i.e., before 2016); *id*., (Dr. Sears testifying that "the group that I'm calling SeeCubic . . . took the source code" on "November 20th, 2010")).

## III. ARGUMENT

### A. THE COURT SHOULD GRANT SUMMARY JUDGMENT BECAUSE REMBRANDT HAS NO PROTECTABLE TRADE SECRETS.

No reasonable fact finder could conclude that Rembrandt has any protectable trade secrets. Under DUTSA, Rembrandt bears the burden to show that its purported trade secrets (a) "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and (b) are "the subject of efforts that are reasonable under the circumstances to maintain their secrecy." 6 *Del. C.* § 2001; *Biohaven Therapeutics Ltd. v. Avilar Therapeutics, Inc.*, No. CV 23-328-JLH-CJB, 2026 WL 2368110, at *5 (D. Del. July 14, 2026) ("a Plaintiff bringing a DUTSA claim must establish the existence of a trade secret and its misappropriation"). There is no genuine issue of material fact that Rembrandt's alleged trade secrets fail to meet either requirement.

#### 1. The Purported Trade Secrets Were Readily Ascertainable To SeeCubic By Proper Means

The purported trade secrets were "readily ascertainable" to SeeCubic "by proper means"—i.e., through Bart Barenbrug (and other Team members who work for SeeCubic's indirect subsidiary SCBV) whose obligation to keep Rembrandt's alleged trade secrets confidential indisputably ended on March 3, 2016.

The NDA that Barenbrug signed in October 2010 is unambiguous: it only requires Barenbrug to keep Rembrandt's information "in confidence . . . for a period of five (5) years from the date of each disclosure of Confidential Information." (SOF #6). Barenbrug and 3DFusion never agreed in writing to amend the NDA, as would be required by the NDA's express terms for any amendment to be effective. (SOF #8-9). Barenbrug's NDA is governed by New York law

(SOF #5), which is clear that when a written agreement is "clear and unambiguous on its face," as Barenbrug's NDA is, it "must be enforced according to the plain meaning of its terms." *Long Island Minimally Invasive Surgery, P.C. v. MultiPlan, Inc.*, 228 A.D.3d 638, 640 (N.Y. 2024). "The threshold question of whether a contract is unambiguous, and the subsequent construction and interpretation of an unambiguous contract, are issues of law within the province of the court" *Id.* "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous," and "[s]uch evidence is not admissible to create an ambiguity." *Id.*

Thus, because Barenbrug terminated his NDA in writing on March 3, 2011 and because it is undisputed that Blumenthal did not relay any confidential information to Barenbrug after he terminated his NDA, Barenbrug's obligation to keep 3DFusion's information (including any trade secrets) confidential ended on March 3, 2016. (SOF #2, 12).

To the extent Rembrandt argues the NDA is ambiguous (which it is not), extrinsic evidence, such as Blumenthal's statements to Barenbrug in 2011, make clear that Blumenthal understood that the confidentiality provision in Barenbrug's NDA expired 5 years after termination. Specifically, in response to Barenbrug's written termination of his NDA, Blumenthal told him that his NDA was still "in effect for five years with regard to all trade secret and other information regarding our business which we shared with you." (SOF #13). Blumenthal's later testimony under oath as Rembrandt's 30(b)(6) witness was consistent: he again confirmed that the confidentiality provisions in Barenbrug's NDA expired in March 3, 2016. (SOF #15 (testifying that the "obligation to keep the information confidential expires on March 2016")). This was also confirmed by Rembrandt's expert. (SOF #16 ("by my calculation, the [NDA] expiration occurred on March 3rd 2016")).

While Rembrandt points to various oral communications, meeting minutes, and emails as

evidence of the Team's agreement to keep Rembrandt's/3DFusion's trade secrets confidential, all these alleged "agreements" occurred prior to October 2010. (SOF #4).[4] These "prior discussions" were expressly merged into the NDAs that the Team (including Barenbrug) signed in October 2010. (SOF #7 ("This Agreement constitutes the entire understanding between the parties hereto as to the Confidential Information and merges all prior discussions between them relating thereto.")). Under New York law, when the merger clause is clear on its face, as it is here, prior or contemporaneous oral agreements cannot be used to contradict, vary, or add to the terms of the NDA. *H.T. v. A.E.*, 9 N.Y.S.3d 593, *3 (N.Y. Sup. Ct. 2014). Thus, any attempt by Rembrandt to use the prior "agreements" with Barenbrug to create a perpetual confidentiality obligation should be rejected as a matter of law.

Barenbrug has been employed by SCBV since 2011, and SCBV has been an indirect subsidiary of SeeCubic at various times since 2020. (SOF #17, 24, 25). Because Barenbrug was under no obligation to keep Rembrandt's purported trade secrets confidential after March 3, 2016, he was free to later disclose those purported trade secrets to SeeCubic, Inc., which was formed four years later in 2020. (SOF #23). Indeed, that is exactly what Rembrandt alleges occurred—i.e., that "[a]ll of the trade secret information was provided to at least Barenbrug while Barenbrug was working with Mr. Blumenthal and 3DFusion" and that "Dr. Barenbrug is available to SeeCubic and has already seen all the trade secrets in question." (D.I. 72 at 1, 3).

New York and Delaware law are in accord that "a temporary pledge to secrecy is exactly that: temporary. Once a third party's confidentiality obligation …expires, so does the trade secret protection." *Structured Capital Solutions, LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 836

[4] Blumenthal confirmed that many of these prior statements were simply referring to "formalizing the [alleged] oral NDA into a written one." (Ex. A, Blumenthal Tr., 97:1-4)

(S.D.N.Y. 2016) (misappropriation claim failed as a matter of law because the information had been disclosed under "a nondisclosure agreement that had long since expired"); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 2005 WL 1089027, at *12 (Del. Ch. May 4, 2005) (dismissing DUTSA claim because "the record on this motion for summary judgment fully and unequivocally supports the conclusion that the only confidentiality obligation in the License Agreement expired four years before H–P disclosed any of Multiflow's confidential information to STM"); *Biohaven Therapeutics*, 2026 WL 2368110, at *5 ("But, here, Defendants haven't made use of the actual list in a way that had any value from the fact that it was secret. Rather, Defendants pursued [Redacted]—under no obligation of confidentiality"); *see also Nova Chemicals, Inc. v. Sekisui Plastics Co.*, 579 F.3d 319, 328 (3d Cir. 2009) (applying Pennsylvania's Uniform Trade Secret Act and holding that "under the terms of the License Agreement, after 1995, NOVA was not required to maintain the secrecy of any information it had acquired from Sekisui. [ ] Thus, the information lost its trade secret status, at least between Sekisui and NOVA, in 1995."); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information ... his property right is extinguished.").

Because DUTSA requires that trade secrets be "not readily ascertainable by proper means," and Rembrandt's purported trade secrets were readily ascertainable through Barenbrug and the Team, the Court should grant summary judgment on Counts III and IV in SeeCubic's favor.

**2. The Purported Trade Secrets Were Not Subject to Reasonable Efforts to Maintain Their Secrecy**

Separately and independently, the Court should grant summary judgment in SeeCubic's favor because the purported trade secrets were not subject to reasonable efforts under the circumstances to maintain their secrecy. 6 *Del. C.* § 2001.

Each NDA was accepted and executed by Blumenthal on behalf of 3DFusion several days after the Team members executed them. (SOF #5). Each NDA contained the same five year expiration discussed above. (SOF #6).

If Blumenthal and Rembrandt wanted to make the confidentiality requirements in the Team's NDAs last in perpetuity, they should have negotiated with the Team to make that happen, but there is no evidence in the record that shows they ever even attempted to do so. A fixed-term confidentiality limit, like the one in the NDAs at issue, "manifest[s] [the plaintiff's] intent that after [the term] there [i]s no need to maintain the secrecy" of the information — the very antithesis of reasonable efforts. *Structured Cap. Sols., LLC*, 177 F. Supp. 3d at 835-36 (citations omitted).

Similarly, the NDAs signed by Roelen and Zuidema included a provision (not in the other NDAs) that those NDAs "will be terminated in the event no employment contract between the parties is signed in the year 2010." (SOF #10). As Rembrandt admits, neither Roelen nor Zuidema executed an employment agreement from 3DFusion "in the year 2010" so their NDAs terminated. (SOF #11; D.I. 1, Ex. 1, ¶59 (3DFusion "never received any signed employment agreement form the Team, and by the end of December 2010, the Team notified [3DFusion] that the Team will not execute the employment agreements")). Blumenthal signed both NDAs days after Roelen and Zuidema did, and there is no evidence in the record that Blumenthal or Rembrandt asked that these provisions be removed before Blumenthal executed the NDAs. (SOF #5, 10). If Blumenthal and 3DFusion wanted to avoid the consequences of this provision in the Roelen and Zuidema NDAs (i.e., having the NDAs terminate in 2010 and have the confidentiality provisions sunset in 2015) they could have negotiated with them to make that happen and there is no evidence showing they ever attempted to do so.

Blumenthal also knew that the Team was developing the 3DFusion source code that contained the purported trade secrets beginning in 2010 (Ex. A, Blumenthal Tr. at 187:5-7, 217:6-11)[5] and that the Team took that code with them after their work with 3DFusion ended in March 2011 (*id*., 77:8-25 ("We did not get Bart's work.")). There is no evidence that Blumenthal, 3DFusion, or Rembrandt ever asked SCBV or Barenbrug to return this information between the time Barenbrug stopped working with 3DFusion in March 2011 and before Rembrandt filed suit against Stream in 2017, which a reasonable person would have done if they wanted to maintain the confidentiality of their purported trade secrets.

Furthermore, Blumenthal allegedly discovered in January 2012 that "Roelen and Barenbrug had benefitted from their violation of their NDAs and breach of fiduciary responsibilities and contractual obligations to 3DFusion" when he allegedly "observed W. Roelen working at Stream's exhibit booth" and exhibiting technology that allegedly "belonged to 3DFusion." (D.I. 1-22, ¶32). Blumenthal also allegedly discovered in 2017 that "Roelen and Barenbrug filed a US patent application" that allegedly "disclose[d] the Confidential Information in violation of their NDAs." (*Id*., ¶33). But despite these alleged discoveries, Rembrandt sat on its hands and did nothing for years. For instance, there is no evidence that prior to 2017, Rembrandt ever requested that Barenbrug or SCBV return its alleged property. And when Rembrandt finally filed suit against Stream in 2017 (when Barenbrug and Roelen were working for its subsidiary SCBV), it never asserted a trade secret misappropriation claim. (SOF #21-22). Indeed, neither Blumenthal, 3DFusion, nor Rembrandt ever filed suit for trade secret misappropriation against Stream, SCBV, or any Team member. The first time that Rembrandt sued anyone for

[5] All exhibits cited herein are attached to the Declaration of Benjamin J. Schladweiler, submitted concurrently herewith.

misappropriating the alleged trade secrets developed in 2010 was when it filed this suit against SeeCubic, Inc. in 2023, more than a decade after Blumenthal was on notice.

In other words, Blumenthal and Rembrandt stood by and watched for more than a decade as members of the Team purportedly "violated" their NDAs and allegedly divulged trade secret information, and they did nothing. Such prolonged inaction is irreconcilable with the conduct of a party diligently seeking to preserve the secrecy of valuable trade secrets.

Any one of these actions/inactions demonstrates Rembrandt did not take reasonable efforts to protect the asserted trade secrets, but taken together, they definitively show that no reasonable factfinder could find that Rembrandt and Blumenthal's efforts to protect the asserted trade secrets were reasonable. Thus, the Court should grant summary judgment in SeeCubic's favor.

**B. REMBRANDT'S MISAPPROPRIATION CLAIMS ARE TIME-BARRED.**

Separately, the Court should grant summary judgment in SeeCubic's favor because Rembrandt's claims are time-barred by the applicable statute of limitations. As discussed below, Rembrandt was on notice more than a decade ago that the same actors who were involved in the alleged misappropriation here (i.e., Barenbrug and SCBV) were allegedly misappropriating those same trade secrets, yet it purposely did not sue Barenbrug or SCBV for misappropriation and instead waited until 2023 to sue SeeCubic once it sought to obtain SCBV's assets.

A claim for misappropriation under the DUTSA "must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." 6 *Del. C.* § 2006. Importantly, under DUTSA "a continuing misappropriation constitutes a single claim." *Id*. This means that each misappropriation of an alleged stolen trade secret does not reset the statute of limitations clock as all misappropriation of that trade secret is treated as a "single claim that accrues when the misappropriation reasonably could be discovered."

*Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.*, 2019 WL 6726836, at *16 (Del. Super. Dec. 4, 2019), *aff'd,* 247 A.3d 674 (Del. 2021).

Rembrandt's theory in this case is that SeeCubic, Inc. misappropriated Rembrandt's purported trade secrets by seeking to obtain and obtaining the assets of Stream and SCBV after SeeCubic, Inc. came into existence in 2020. (D.I. 1, ¶¶36 ("Consequently, SeeCubic's activities to develop, commercialize and market the Ultra D 3D no glasses LCD platform technology, which they clearly state that they had acquired from Stream, was for developing the product and to make sales to customers, are all in direct violation of the R3D's ownership rights.") 51 ("the Philips WOWvx platform with Plaintiff's technology has virtually unlimited value, and the Defendants know it—that's why they have been fighting so fiercely to acquire control")). In other words, Rembrandt's theory is not that SeeCubic, Inc. actually stole its alleged trade secrets directly from Rembrandt, but rather that SeeCubic sought to acquire them from someone else (i.e., SCBV and Barenbrug) who allegedly did a decade ago.

Under Delaware law, the statute of limitations begins to run when a plaintiff has (1) actual notice of the basis for the cause of action or (2) has inquiry notice—i.e., "notice of facts from which the basis for the cause of action could have been discovered by the exercise of reasonable diligence." *RoboticVISIONTech, Inc. v. ABB Inc.*, 726 F. Supp. 3d 364, 368 (D. Del. 2024). "A party is on inquiry notice when it has facts sufficient to make it suspicious or that ought to make it suspicious. Those facts effectively must rise to the level of a 'red flag' that would prompt a prudent person of ordinary intelligence to further investigate a possible claim." *Id.*

Rembrandt admits that it at least had inquiry notice (if not actual notice) of potential misappropriation claims against SCBV and Barenbrug more than a decade before it filed this suit (and many years before SeeCubic, Inc. existed). For instance, Rembrandt and its predecessor

3DFusion had actual and inquiry notice of a potential claim since "January 2012" when Blumenthal (Rembrandt's founder and CEO) allegedly saw Barenbrug and Roelen (who were at the time working for Stream's subsidiary SCBV) exhibiting technology that alleged "belonged to 3DFusion." (SOF #19). Rembrandt also had actual and inquiry notice in 2017 when Blumenthal allegedly learned that "Roelen and Barenbrug filed a US patent application" that allegedly "disclose[d] the Confidential Information in violation of their NDAs such as, for example, the border-blending and depth smoothing functions." (SOF #20); *see Raza v. Siemens Med. Sols. USA Inc.*, 607 F. Supp. 2d 689, 693 (D. Del. 2009) ("Courts have recognized that the public disclosure of products, as well as the publicly noticed filing of patent protection constitutes, at a minimum, constructive knowledge for purposes of discovering a claim based on the misappropriation of trade secrets and commencing the limitations period under the statute.").

Indeed, in 2017, after receiving this notice, Rembrandt sued Stream (who at the time owned SCBV, which in turn employed Barenbrug) for several causes of action, none of which were trade secret misappropriation. (D.I. 1, Ex. 1). While the Complaint in that action did not include a trade secret misappropriation claim, Rembrandt noted that the Team members were violating their NDA with 3DFusion in or about "January 2012" and "2017" and allegedly sought to "vindicate its rights, prevent any further infringement of its patents, ***preclude any further misuse*** of its confidential, proprietary, and ***trade secret information***." (D.I. 1, Ex. 1, ¶¶121, 111, 114; Ex. 22, ¶32-33) (emphasis added). These allegations leave no doubt that Rembrandt believed, by 2012 at the earliest and 2017 at the latest, that its alleged trade-secret information had already been misused, yet Rembrandt waited until 2023 to bring its first misappropriation suit, after the applicable three-year statute of limitations expired.

Rembrandt was clearly time-barred from bringing a claim against SCBV or Barenbrug when it filed this suit in 2023 given the notice it received in 2012 and 2017. It cannot avoid the limitations period by repackaging this time-barred conduct as a claim against SeeCubic. Yet that is exactly what Rembrandt attempts to do—it accuses SeeCubic, Inc. of misappropriation for acquiring the alleged trade secrets allegedly in SCBV's possession after the statute of limitations had already expired as to SCBV. DUTSA explicitly rejects this theory by noting that "a continuing misappropriation constitutes a single claim" regardless of whether the misappropriation is a "use" or "acquisition." 6 *Del. C.* §§ 2001, 2006. Because Rembrandt is time-barred from suing SCBV and Barenbrug for using the alleged trade secrets, it is also time-barred under the "single claim" theory from suing SeeCubic for acquiring and then using those same alleged trade secrets years later. *See Ocimum*, 2019 WL 6726836, at *16; *Kehoe Component Sales Inc. v. Best Lighting Products, Inc.*, 796 F.3d 576 (6th Cir. 2015) (applying Ohio's version of the Uniform Trade Secret Act and holding that use of trade secrets followed by a sale of those trade secrets was a "single claim"); *B&P Littleford, LLC v. Prescott Machinery, LLC*, 2021 WL 3732313 (6th Cir. Aug. 24, 2021) (under the single claim rule "it is the first discoverable misappropriation of '*a* trade secret' that commences the limitation period for a claim based on misappropriation of *that* trade secret") (emphasis in original).[6]

Thus, summary judgment should be entered in favor of SeeCubic.

[6] Moreover, Rembrandt has treated SeeCubic, SCBV, and Barenbrug as one in the same throughout this litigation. For instance, Rembrandt's expert includes Barenbrug and SCBV in his definition of "SeeCubic" and testified "that the group that I'm calling SeeCubic . . . took the source code" on "November 20th, 2010," more than twelve years before Rembrandt filed this case. (SOF #33).

## IV. CONCLUSION

For the foregoing reasons, the Court should grant summary judgment as to Counts III and IV of the Complaint in favor of SeeCubic because (1) Rembrandt's alleged trade secrets are not protectable, and (2) Rembrandt's claims are time-barred by the statute of limitations.

OF COUNSEL:

Giancarlo Scaccia
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
212.801.6831
scacciag@gtlaw.com

Dated: September 18, 2026

GREENBERG TRAURIG, LLP

*<u>/s/ Benjamin J. Schladweiler</u>*
Benjamin J. Schladweiler (#4601)
Renée Mosley Delcollo (#6442)
222 Delaware Avenue, Ste. 1600
Wilmington, DE 19801
302.661.7000
schladweilerb@gtlaw.com
renee.delcollo@gtlaw.com

*Attorneys for Defendant SeeCubic, Inc..*

**CERTIFICATE OF SERVICE**

I, Benjamin J. Schladweiler, do hereby certify that a copy of the foregoing document was served via e-mail on this 18th day of September 2026, upon the following counsel of record:

Dean Amburn
David Holloway
AMBURN LAW
1504 N. Broom St., Suite 1
Wilmington, DE 19806
dwa@amburnlaw.com

*/s/ Benjamin J. Schladweiler*
Benjamin J. Schladweiler (#4601)

*Attorneys for Defendant SeeCubic, Inc.*