**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| REMBRANDT 3D HOLDING LTD., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 23-193-JLH-SRF |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| SEECUBIC, INC., | ) | FILED UNDER SEAL |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF REMBRANDT 3D HOLDING LTD.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANT SEECUBIC, INC.'S THIRD AND SEVENTH AFFIRMATIVE DEFENSES AND COUNTERCLAIM COUNTS I (IN PART), II, AND III**

AMBURN LAW
Dean W. Amburn (#7295)
David H. Holloway (#5762)
1504 N. Broom Street, Suite 1
Wilmington, DE 19806
(302) 285-9485
dwa@amburnlaw.com
dholloway@amburnlaw.com

*Attorneys for Plaintiff Rembrandt 3D Holding Ltd.*

Dated: September 18, 2026

## TABLE OF CONTENTS


**Page**

NATURE AND STAGE OF THE PROCEEDINGS ........ 1

SUMMARY OF ARGUMENT ........ 1

STATEMENT OF FACTS ........ 3

A. Rembrandt Licenses Its Technology to Stream ........ 3

B. SeeCubic Takes Stream's Assets ........ 4

C. SeeCubic Admits It Has No License ........ 6

D. The Counterclaims and the Record ........ 6

ARGUMENT ........ 8

I. LEGAL STANDARD ........ 8

II. SEECUBIC'S SEVENTH AFFIRMATIVE DEFENSE FAILS AS A MATTER OF LAW ........ 9

A. SeeCubic Has Conclusively Admitted That It Has No License ........ 9

B. The Agreement Licenses Stream, Not SeeCubic ........ 9

C. SeeCubic Acquired No License Through SCBV or the Bankruptcy Sale ........ 10

III. REMBRANDT'S CLAIMS AGAINST SEECUBIC ARE TIMELY ........ 11

IV. COUNTS II AND III FAIL AS A MATTER OF LAW ........ 14

A. Both Counts Require a Specific Expectancy, Wrongful Interference, Causation, and Damages ........ 14

B. There Is No Evidence of a Business Expectancy That Rembrandt Defeated ........ 15

C. Nothing Rembrandt Did Was Wrongful ........ 16

1. Settling with Stream and licensing its technology. ........ 16

2. Petitioning the courts. ........ 17

3. Pre-suit assertions of Rembrandt's rights. ........ 18

4. Declining to license SeeCubic. ........ 18

D. There Is No Evidence of Proximate Causation or Damages ........ 19

E. Count III Falls With Count II ........ 20

CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865 (Del. Ch. Jan. 20, 2009)....15, 18

*Beard Research, Inc. v. Kates*, 8 A.3d 573 (Del. Ch. 2010)....19

*Cadence Design Sys., Inc. v. Avant! Corp.*, 29 Cal. 4th 215 (2002)....13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)....8

*Charpentier v. Godsil*, 937 F.2d 859 (3d Cir. 1991)....15

*Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119 (3d Cir. 1999)....17

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)....17

*Cousins v. Goodier*, 283 A.3d 1140 (Del. 2022)....14

*Cypress Semiconductor Corp. v. Superior Court*, 163 Cal. App. 4th 575 (2008)....13

*DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151 (Del. 1981)....14

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187 (3d Cir. 2001)....10, 11

*Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204 (3d Cir. 2001)....15

*Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965 (3d Cir. 1982)....9

*Flores v. Strauss Water Ltd.*, 2016 WL 5243950 (Del. Ch. Sept. 22, 2016)....16, 18, 19

*Langer v. Monarch Life Ins. Co.*, 966 F.2d 786 (3d Cir. 1992)....9

*Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261 (Del. Super. Ct. 2001)....14, 15

*Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, 2011 WL 678707 (D. Del. Feb. 18, 2011)....18

*Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242 (Del. 2007)....19

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001)....14, 18

*Nuance Commc'ns, Inc. v. MModal LLC*, 2018 WL 6804488 (D. Del. Dec. 27, 2018), *report and recommendation adopted*, 2019 WL 181322 (D. Del. Jan. 11, 2019)....17

*Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.*, 2019 WL 6726836 (Del. Super. Ct. Dec. 4, 2019), *aff'd*, 247 A.3d 674 (Del. 2021)....12

*Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153 (Del. 2010)....9

*Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993)....17

*Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022)....4

*Tatum v. Fairstead Affordable LLC*, 347 A.3d 1221 (Del. Ch. 2025)....19

*Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043 (Del. Super. Ct. 2001)....14, 20

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004) ........................................12
*WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168 (Del. 2012) ..14, 16

**Statutes and Rules**

6 *Del. C.* § 2001 ........................................................................................................1, 13
6 *Del. C.* § 2006 ...................................................................................................1, 11, 12
6 *Del. C.* § 2008 ...........................................................................................................13
11 U.S.C. § 365...............................................................................................................11
Fed. R. Civ. P. 8(c) ..........................................................................................................12
Fed. R. Civ. P. 26(a)(1)(A)(iii) .......................................................................................19
Fed. R. Civ. P. 36(b) ......................................................................................................1, 9
Fed. R. Civ. P. 37(c)(1)...................................................................................................19
Fed. R. Civ. P. 56 ..........................................................................................................1, 9
Fed. R. Evid. 801(d)(2) .....................................................................................................9

**Other Authorities**

Restatement (Second) of Torts § 762 (1979)..................................................................18
Restatement (Second) of Torts § 767 (1979)..................................................................14
Restatement (Second) of Torts § 773 (1979)..................................................................16

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Rembrandt 3D Holding Ltd. ("Rembrandt") alleges that Defendant SeeCubic, Inc. ("SeeCubic") misappropriated Rembrandt's trade secrets for glasses-free 3D display technology in violation of the Delaware Uniform Trade Secrets Act ("DUTSA"), 6 *Del. C.* § 2001 *et seq.* (D.I. 1 (filed Feb. 21, 2023).) SeeCubic's Answer pleads as its Third Affirmative Defense that Rembrandt's claims "are barred by all applicable statutes of limitations, including 6 *Del. C.* § 2006," and as its Seventh Affirmative Defense that SeeCubic "has a license to Plaintiff's purported trade secrets" under the May 23, 2021 Settlement Agreement and Mutual Release between Rembrandt and Stream TV Networks, Inc. ("Stream"). (D.I. 27 at 33.) It asserts counterclaims for a declaration of no misappropriation, including on the ground that Rembrandt's claims "are time-barred pursuant to 6 *Del. C.* § 2006" (Count I), tortious interference with existing and prospective business relations (Count II), and unfair competition (Count III). (*Id.* ¶¶ 74–99.) The Court denied both sides' Rule 12 motions (D.I. 26; D.I. 49), the other defendants have been dismissed (D.I. 125; D.I. 126), discovery has closed, and dispositive motions are due September 18, 2026. (D.I. 131; D.I. 153.) Rembrandt moves under Rule 56 for partial summary judgment on the Third and Seventh Affirmative Defenses, on Count I insofar as it seeks a declaration that Rembrandt's claims are time-barred, and on Counts II and III.

## SUMMARY OF ARGUMENT

1. SeeCubic has no license. It admitted as much under Rule 36 ("Admitted that SeeCubic, Inc. has no license"), and its Chairman and Rule 30(b)(6) designee testified that the Settlement Agreement "does not" apply to SeeCubic and that SeeCubic "never asked for nor thought it needed any sort of license from Rembrandt." Those admissions are conclusive. They are also correct. The Agreement grants a non-exclusive license to "Stream TV" alone; § 22 is a binding-effect clause,

not a grant; SeeCubic is not a party, subsidiary, affiliate, successor, or assign of Stream; and when SeeCubic bought Stream's assets in bankruptcy it expressly excluded "any grant of rights or license by Rembrandt" from the purchase, disclaimed successor status, and acknowledged that the assets "may be subject to superior rights of Rembrandt as Licensor."

2. Rembrandt's claims against SeeCubic are timely. SeeCubic was formed in May 2020, first came into possession of the technology on December 9, 2020, and was sued on February 21, 2023, less than three years later. Its limitations defense assumes that the three-year period began in 2012, when a different company first misappropriated the technology. But a claim accrues against each defendant when that defendant's misappropriation is or should be discovered; the "single claim" rule bars only serial suits over the same defendant's continuing use. SeeCubic has itself told this Court that it "didn't even exist when these alleged trade secrets were misappropriated."

3. Counts II and III fail on every element. After three years of discovery SeeCubic cannot identify a single customer, licensee, contract, or transaction that Rembrandt caused it to lose. Its "business relations" are unpaid loans to insolvent Stream subsidiaries that SeeCubic itself has owned since January 2025. And nothing Rembrandt did was wrongful. Settling its own lawsuit with Stream and licensing its own technology, petitioning the bankruptcy court and this Court, giving notice that it would enforce its rights, and declining to license SeeCubic are lawful exercises of Rembrandt's legal rights, protected by Delaware's justification privilege and by the *Noerr-Pennington* doctrine. Rembrandt's claims are not a sham: this Court has held them plausible, and Rembrandt's expert found Rembrandt's trade secrets in SeeCubic's code.

4. SeeCubic has no evidence of causation or damages. The Stream affiliates' debts went unpaid because the debtors were insolvent, not because of Rembrandt, and SeeCubic ultimately

took every one of those entities and their assets through a $150 million credit bid. What remains is SeeCubic's demand for the attorneys' fees it has spent defending this action, which the American Rule forbids and for which SeeCubic disclosed no computation and retained no expert.

## STATEMENT OF FACTS

### A. Rembrandt Licenses Its Technology to Stream

Rembrandt's predecessor, 3DFusion, worked in 2010 with the Eindhoven engineers who became the technical staff of Stream's Dutch subsidiary, SeeCubic B.V. ("SCBV"). (D.I. 1 ¶¶ 4, 12; Ex. 2 at 17:1–19:12, 68:6–69:6 (A0159–61, A0168–69).)[1] In 2017 Rembrandt sued Stream and its principals in the Southern District of New York. (D.I. 1 ¶¶ 72–74.) On April 9, 2019, Stream's Chief Financial Officer and Vice Chairman, Shadron Stastney, negotiated and initialed a Settlement Term Sheet providing that Rembrandt would grant "a non-exclusive license to Stream." (D.I. 1, Ex. 5; Ex. 1 at 38:20–39:3, 151:5–152:23 (A0032–33, A0103–04).) Mr. Stastney "was in favor of Stream doing this deal" on those terms. (Ex. 1 at 156:1–12 (A0108).)

On May 23, 2021, Rembrandt, Stream, and Stream's principals executed the Settlement Agreement and Mutual Release (the "Agreement"), which Mr. Stastney agrees is "substantially the same" as the term sheet he negotiated. (D.I. 1, Ex. 2; Ex. 1 at 177:19–178:15 (A0120–21); Ex. 2 at 100:11–102:3 (A0179–81).) In § 9, "Rembrandt hereby grants a non-exclusive license to Stream TV to all Rembrandt Technologies listed in Schedule A." (D.I. 1, Ex. 2 § 9.) Section 14 permits each "Party" to "sublicense their rights to other parties for the purpose of having products distributed by the Party." (*Id.* § 14.) Section 22, captioned "Binding Effect," provides that the Agreement "shall be binding on, and shall be enforceable against, and shall inure to the benefit of

[1]Citations to "Ex." are to the exhibits to the Declaration of Dean W. Amburn filed herewith; citations to "A" pages are to the accompanying Appendix, in which the exhibits are compiled.

the Parties to this Agreement and their respective past and present officers, directors, affiliates, member firms, subsidiaries, parents, successors, . . . and assigns." (*Id.* § 22.) Stream agreed to pay $1,528,000 "immediately" and to make further payments. (*Id.* § 15.) Charles "Bud" Robertson, Stream's Executive Vice President, who helped document the Agreement, testified that Stream "fully intended" to perform, that the Agreement was Stream's way "to clear the chain of title," and that any allegation that it was "a fake deal to interfere with [SeeCubic's] business" is "false." (Ex. 2 at 94:1–16, 102:4–13, 105:2–106:13, 180:10–181:11 (A0174, A0181, A0184–85, A0198–99).) Stream defaulted on its payment obligations. (*Id.* at 104:3–24, 181:13–19 (A0183, A0199).) The same day the Agreement was signed, Rembrandt joined other petitioning creditors in an involuntary Chapter 7 petition against Stream, which the Delaware bankruptcy court dismissed. (D.I. 1 ¶ 90; D.I. 27 ¶¶ 47–48; Ex. 2 at 182:20–183:18 (A0200–01).)

**B. SeeCubic Takes Stream's Assets**

SeeCubic "was founded in 2020 by the secured creditors of Stream TV Networks . . . to acquire substantially all the assets of Stream TV, including all subsidiaries and all technology assets." (Ex. 1 at 257:14–258:4 (A0149–50) (SeeCubic private placement memorandum); *id.* at 65:7–66:1 (A0058–59); D.I. 146 ¶ 4.) SeeCubic was incorporated in May 2020. (D.I. 146 ¶ 4; D.I. 143 ¶ 3.) Mr. Stastney, who had resigned from Stream in January 2020, is SeeCubic's Chairman and CEO. (Ex. 1 at 9:3–6, 59:22–60:1 (A0006, A0052–53).) Stream has never owned or controlled SeeCubic; the two have been adverse since 2020. (Ex. 1 at 65:7–11, 71:25–72:10 (A0058, A0064–65); D.I. 143 ¶ 6.) Under a Court of Chancery injunction entered December 8, 2020, SeeCubic took control of Stream's subsidiaries, including SCBV; SeeCubic's designee testified that its "indirect possession of Ultra-D technology came via the acquisition of SeeCubic B.V. as an indirect subsidiary," which "first occurred in December 9 of 2020." (Ex. 1 at 23:1–19 (A0020).)

In June 2022 the Delaware Supreme Court held the underlying agreement invalid, and SCBV returned to Stream. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022); (Ex. 1 at 37:1–17 (A0031); D.I. 146 ¶¶ 5–8). Stream filed for Chapter 11 in March 2023, and on September 20, 2023 a Dutch court appointed Mr. Stastney director of SCBV, a position he still holds. (D.I. 146 ¶¶ 9–10; Ex. 5 at 39 (A0282); Ex. 1 at 63:21–24 (A0056); D.I. 143 ¶ 7.)

On December 9, 2024, the bankruptcy court approved the sale of substantially all of Stream's assets to SeeCubic, the stalking-horse bidder, for a $150 million credit bid of debt SeeCubic already held; the sale closed January 3, 2025, and SeeCubic rebranded the acquired Ultra-D software "DepthAware." (Ex. 5 at 1–3 (A0244–46); Ex. 6 (A0328–29); Ex. 1 at 25:15–26:12, 110:11–111:18 (A0022–23, A0083–84).) The Asset Purchase Agreement ("APA") SeeCubic negotiated lists among the "Excluded Assets" "all Contracts . . . of Stream"; "any grant of rights or license by Rembrandt 3D Holding Ltd. . . . to Stream, including . . . the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release . . . dated May 23, 2021, any amendment thereto, and the Licensing Covenant . . . dated August 14, 2023"; and "any physical assets that contain or include Rembrandt Intellectual Property." (Ex. 5, APA § 2.2(i)–(k) (A0296).) SeeCubic "acknowledge[d] that certain Intellectual Property may be subject to superior rights of Rembrandt as Licensor, and that Sellers cannot transfer any interest in the Transferred Assets that is not owned by the Sellers" (*id.* § 3.4(a) (A0302)); agreed that it "shall not be deemed to . . . be the successor of any Seller" (*id.* § 5.6 (A0308)); and assumed liability for any claim that "the Rembrandt Intellectual Property[] has been improperly transferred or sold to the Buyer." (*Id.* §§ 2.3, 9.2 (A0296, A0317).) The Sale Order found that "the Buyer is not taking an assignment of any executory contracts . . . therefore there are no Assigned Contracts" (Ex. 5 ¶ GG (A0257)), and provided that "Rembrandt 3D Holding Ltd. is not an Enjoined Party with respect to claims it

purports to have against the Buyer related to Rembrandt Intellectual Property alleged to be part of the Transferred Assets." (*Id.* ¶ 12 (A0262–63).) Mr. Stastney "understood this order"; SeeCubic was "willing to assume the risk of litigation regarding the Rembrandt intellectual property"; and under the APA, "to the extent Rembrandt asserts any rights, it's the buyer's problem." (Ex. 1 at 194:19–23, 195:21–196:7, 198:17–25 (A0126, A0127–28, A0130).)

### C. SeeCubic Admits It Has No License

Asked to "[a]dmit that Defendant does not have a license from Rembrandt for any intellectual property owned by Rembrandt," SeeCubic answered: "Admitted that SeeCubic, Inc. has no license but denied that Rembrandt has any protectable trade secrets." (Ex. 3, Resp. to Req. No. 4 (A0211).) SeeCubic's Rule 30(b)(6) designee testified that the Agreement "appears to be intended to bind Stream," that it "does not bind all successor entities, certainly not someone taking assets in a bankruptcy," and, asked "Does it apply to SeeCubic, Inc.?," answered: "It does not." (Ex. 1 at 175:17–25 (A0118).) SeeCubic "never asked for nor thought it needed any sort of license from Rembrandt" (*id.* at 66:17–67:10, 71:10–13 (A0059–60, A0064)), and "has not conducted negotiations for the licensing of technology." (Ex. 4 at 25 (A0240).) In Mr. Stastney's words, "[t]his agreement is irrelevant to me." (Ex. 1 at 175:5–9 (A0118).)

### D. The Counterclaims and the Record

Counts II and III rest on the same allegations: that Rembrandt "concocted a scheme to prevent SeeCubic from recouping at least $37 million in investments in, and loans made to, Stream's subsidiaries" SCBV, Ultra-D Coöperatief U.A., and Stream TV International B.V., by (i) the April 20, 2021 emails; (ii) the Agreement and the same-day involuntary petition; (iii) the August 2023 Amendment and Rembrandt's covenant with Stream and Visual Semiconductor, Inc. ("VSI") not to license SeeCubic or its principals; (iv) July 27 and August 7, 2023 emails asserting

Rembrandt's rights to SCBV's court-appointed independent director, Jasper Berkenbosch, who then resigned; and (v) "this baseless lawsuit." (D.I. 27 ¶¶ 39–50, 64–73, 82–99; Ex. 4 at 12–16 (A0227–31).) Asked to identify each business expectation with which Rembrandt interfered, its value, and how Rembrandt interfered, SeeCubic's final response, served on the last day of fact discovery, names no customer, licensee, or transaction. It says that Rembrandt "interfered with SeeCubic's ability to collect on the Stream debt by bringing this baseless lawsuit," that "SeeCubic BV has since changed ownership through the bankruptcy auction," and that "Rembrandt's actions have forced SeeCubic to spend millions of dollars in unnecessary attorney fees." (Ex. 4 at 16 (A0231).)

The April 20, 2021 emails were sent by Rembrandt's counsel, while Rembrandt's motion to enforce the term sheet was pending, to Stream's bankruptcy counsel, to counsel for Stream's creditors, and to SeeCubic's own counsel; they proposed "a negotiated settlement" and stated that Rembrandt's rights "are not transferring to SeeCubic" because "Stream TV can not transfer rights it does not own." (D.I. 1 ¶ 89 & Exs. 19–21.) Mr. Robertson testified that there was no "coordination between the parties." (Ex. 2 at 183:4–18 (A0201).)

Stream's own bankruptcy counsel wrote to Mr. Berkenbosch on July 25, 2023 about a proposed customer agreement; Rembrandt's counsel followed two days later with notice that it would protect its rights. (Ex. 11 ¶¶ 2.24–2.25 (A0374); Ex. 2 at 125:5–128:12 (A0190–93).) In asking to be relieved, Mr. Berkenbosch cited "great resistance from Stream and Rembrandt," "SCI['s]" (SeeCubic's) position that "it will no longer provide financing if its projects are not worked on," and that "no expenses of my office have been paid so far." (Ex. 11 ¶ 2.26 (A0374).) Six weeks later the Dutch court appointed Mr. Stastney director of SCBV. (D.I. 146 ¶ 10; Ex. 11 ¶ 5.20 (A0381).)

SeeCubic has never had a licensee or a customer for the technology: it has "no licensed customers yet," has not "lost any customers," has "no commercial relationship with any entity anywhere yet," and "do[es]n't have any contracts in negotiation or in execution." (Ex. 1 at 70:1–18, 95:10–18, 98:16–20, 104:7–10, 114:19–25 (A0063, A0070, A0073, A0078, A0087).) [redacted] (*id.* at 14:24–15:7, 18:13–17 (A0011–12, A0015)), and Stream had been in default on its secured debt since March 2020 (*id.* at 227:15–228:5 (A0137–38)). SeeCubic disclosed no computation of damages (Ex. 7 § I.C (A0335)), served no damages expert, and asserts no lost-transaction damages in its interrogatory answers. (Ex. 4 at 12–16 (A0227–31).)

Rembrandt's claims, by contrast, have been tested. This Court denied SeeCubic's motion to dismiss, holding that Rembrandt "adequately described the alleged trade secrets" and "sufficiently plead that it maintained its trade secrets." (D.I. 26.) After inspecting SeeCubic's source code, Rembrandt's expert, Russell C. Sears, Ph.D., found that SeeCubic's code base was built on bulk imports of code and tools from 3DFusion and that the "vast majority" of Rembrandt's trade secrets are "widely used" across SeeCubic's products. (Ex. 10 ¶¶ 13–16, 34–44, 73–80, 247, 264 (A0351–62).) SeeCubic's CEO never had the code examined for Rembrandt's technology beyond asking two SCBV engineers, took "[n]o external help," has "not" made any effort to determine the question, and "do[es]n't know" whether it is there. (Ex. 1 at 52:22–53:15, 121:14–23, 142:12–143:15, 199:13–200:12 (A0046–47, A0092, A0097–98, A0131–32).)

## ARGUMENT

### I. LEGAL STANDARD

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant may carry its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case," *id.* at 325, and the nonmovant may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rule 56 authorizes judgment on "part of each claim or defense." Fed. R. Civ. P. 56(a).

## II. SEECUBIC'S SEVENTH AFFIRMATIVE DEFENSE FAILS AS A MATTER OF LAW

### A. SeeCubic Has Conclusively Admitted That It Has No License

SeeCubic bears the burden of proving its affirmative defense. It cannot, because it has admitted the dispositive fact. A matter admitted under Rule 36 "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). Rule 36 admissions "are conclusive for purposes of the litigation and are sufficient to support summary judgment." *Langer v. Monarch Life Ins. Co.*, 966 F.2d 786, 803 (3d Cir. 1992). SeeCubic has never moved to withdraw its admission that "SeeCubic, Inc. has no license." (Ex. 3, Resp. to Req. No. 4 (A0211).) Its Rule 30(b)(6) testimony that the Agreement "does not" apply to SeeCubic, its interrogatory answer that it "has not conducted negotiations for the licensing of technology," and its CEO's testimony that SeeCubic "never asked for nor thought it needed any sort of license" are party admissions to the same effect. Fed. R. Evid. 801(d)(2). A defense the defendant itself disavows cannot go to a jury.

### B. The Agreement Licenses Stream, Not SeeCubic

The admissions are also correct as a matter of contract law. Delaware reads a contract "as a whole," gives "each provision and term effect," and enforces "the plain-meaning of the contract's terms and provisions." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010). The

only grant of rights in Rembrandt's technology is § 9, and it runs to "Stream TV." Section 14 confines sublicensing to "having products distributed by the Party." Section 22, on which SeeCubic relies, grants nothing; it is a standard binding-effect clause identifying who is bound by, and who may enforce, the parties' promises. Reading "inure to the benefit of . . . subsidiaries" to make everyone listed in § 22 a licensee would render § 9's grant to "Stream TV" and § 14's limit on sublicensing surplusage, an "unreasonable interpretation" that "no reasonable person would have accepted when entering the contract." *Id.* at 1159–60.

Even on its own terms, § 22 does not reach SeeCubic. SeeCubic was "founded in 2020 by the secured creditors of Stream" to take Stream's assets (Ex. 1 at 257:14–258:4 (A0149–50)); it has never been Stream's subsidiary, parent, or affiliate; and it disclaimed being Stream's "successor" in the very agreement by which it acquired Stream's assets. (Ex. 5, APA § 5.6 (A0308).) A non-party claiming rights under a contract must show that the contracting parties intended to benefit it and that "the intent to benefit the third party [was] a material part of the parties' purpose in entering into the contract." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 196 (3d Cir. 2001) (Delaware law). In *DuPont*, a clause making the agreement "for the benefit of" the parties "and their respective lawful successors and assignees" did not make even a parent company a beneficiary. *Id.* at 196–97. Nothing in the record suggests that Rembrandt and Stream intended in May 2021 to license Stream's adversary; Rembrandt's contemporaneous correspondence said the opposite (D.I. 1, Exs. 19–21), and SeeCubic's own counterclaims plead that the Agreement was a "scheme" to keep Stream's assets away from SeeCubic. (D.I. 27 ¶¶ 39, 44–46.) A contract SeeCubic characterizes as a plot against it cannot also be one intended for its benefit.

### C. SeeCubic Acquired No License Through SCBV or the Bankruptcy Sale

SeeCubic's pleading posits that SCBV, "as Stream's subsidiary, has a license commensurate in scope with the license that Stream purportedly has." (D.I. 27 ¶ 68.) Even if that were so, it would not help SeeCubic, which is SCBV's indirect parent, not Stream's subsidiary; a parent does not acquire its subsidiary's contract rights by owning its stock. *DuPont*, 269 F.3d at 196–97. The contracting parties, moreover, have confirmed that Stream's subsidiaries may use the technology "solely for the benefit of Stream" (Ex. 8 § I.C.1 (A0340)), and Stream told the bankruptcy court that "the license does not allow Stream's subsidiaries to use Rembrandt IP for their own projects or for projects that benefit third parties other than Stream." (Ex. 2 at 66:24–68:2 (A0166–68).) SCBV's development and demonstration of products for SeeCubic's benefit is the conduct Rembrandt complains of, not a license for it.

Nor did the bankruptcy sale transfer any license. A license is an executory contract that passes to a purchaser only if assumed and assigned under 11 U.S.C. § 365. The Sale Order found that "the Buyer is not taking an assignment of any executory contracts" (Ex. 5 ¶ GG (A0257)), and the APA excluded "any grant of rights or license by Rembrandt . . . to Stream, including . . . the Rembrandt Grant of Rights in the Settlement Agreement" from the Transferred Assets. (*Id.*, APA § 2.2(j) (A0296).) Having bought the assets on the express understanding that they "may be subject to superior rights of Rembrandt as Licensor" (*id.* § 3.4(a) (A0302)), that Rembrandt was "not an Enjoined Party" (*id.* ¶ 12 (A0262–63)), and that Rembrandt's claims were "the buyer's problem" (Ex. 1 at 198:17–25 (A0130)), SeeCubic cannot now claim that the same sale delivered it a Rembrandt license. Finally, whatever its scope, a license that commenced on May 23, 2021 (D.I. 1, Ex. 2 § 4) could not authorize SeeCubic's use of the technology from December 2020 forward. Summary judgment should be entered on the Seventh Affirmative Defense.

## III. REMBRANDT'S CLAIMS AGAINST SEECUBIC ARE TIMELY

SeeCubic pleads that Rembrandt's claims "are barred by all applicable statutes of limitations, including 6 *Del. C.* § 2006," and seeks a declaration that they "are time-barred pursuant to 6 *Del. C.* § 2006 as the first misappropriation and public disclosure by a third party occurred in 2012." (D.I. 27 at 33 & ¶ 79.) Limitations is an affirmative defense on which SeeCubic bears the burden at trial, Fed. R. Civ. P. 8(c)(1), and the undisputed chronology forecloses it.

Section 2006 provides that "[a]n action for misappropriation must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered," and that "a continuing misappropriation constitutes a single claim." 6 *Del. C.* § 2006. Rembrandt sued SeeCubic on February 21, 2023. (D.I. 1.) SeeCubic did not exist until May 2020 (D.I. 146 ¶ 4; D.I. 143 ¶ 3); its possession of the technology "first occurred in December 9 of 2020" (Ex. 1 at 23:1–19 (A0020)); and it acquired Stream's source code and rebranded the technology in January 2025. (*Id.* at 25:15–26:12, 34:20–35:10 (A0022–23, A0028–29).) Rembrandt's claims against SeeCubic rest on SeeCubic's own conduct: acquiring the technology with knowledge of Rembrandt's rights, using and marketing it as SeeCubic's own, and threatening to sell it. (D.I. 1 ¶¶ 99, 105–106, 119–128.) Even if Rembrandt had discovered SeeCubic's conduct the day SeeCubic was incorporated, this action would be timely. A cause of action accrues no earlier than "the time of the wrongful act," *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004), and no claim against SeeCubic could accrue before SeeCubic existed.

SeeCubic's theory is that the limitations period began to run in 2012, when Stream's Dutch subsidiary first misappropriated the technology, because "a continuing misappropriation constitutes a single claim." That misreads the statute. The single-claim rule governs repeated misuse by the same misappropriator: it "means a plaintiff may not bring separate trade secret claims for each use of the same trade secret." *Ocimum Biosolutions (India) Ltd. v. AstraZeneca*

*UK Ltd.*, 2019 WL 6726836, at *16 (Del. Super. Ct. Dec. 4, 2019), *aff'd*, 247 A.3d 674 (Del. 2021). It does not fuse a plaintiff's claims against different defendants into one. Construing the identical provision of California's Uniform Trade Secrets Act, the California Supreme Court held that "a claim for misappropriation of a trade secret arises for a given plaintiff against a given defendant only once, at the time of the initial misappropriation, subject to the discovery rule," and that "there may be separate claims of continuing misappropriation among different defendants, with differing dates of accrual and types of tortious conduct." *Cadence Design Sys., Inc. v. Avant! Corp.*, 29 Cal. 4th 215, 223–24 (2002). Addressing a third party that acquired the secrets from the original misappropriator—SeeCubic's position here—the Court of Appeal held that "a cause of action for misappropriation against a third party defendant accrues with the plaintiff's discovery of that defendant's misappropriation," so that the claim against the third party "is a separate claim with its own limitations period." *Cypress Semiconductor Corp. v. Superior Court*, 163 Cal. App. 4th 575, 584–85 (2008). Any other rule, the court explained, would allow "a third party defendant . . . to engage in its own misappropriation without risk of suit so long as it waited for the three years to run on the original misdeed." *Id.* at 585.

Delaware's Act, which "shall be applied and construed to effectuate its general purpose to make uniform the law" among the states that have adopted it, 6 *Del. C.* § 2008, compels the same reading. Its definition of misappropriation independently reaches any "person" who discloses or uses a trade secret knowing it was "[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." *Id.* § 2001(2). SeeCubic's acquisition and use of the technology with knowledge of Rembrandt's rights is its own misappropriation, and Rembrandt's claim against SeeCubic accrued when Rembrandt discovered it—which could not have been before 2020. SeeCubic has said as much: opposing Rembrandt's motion for a

preliminary injunction, it described itself as a party "who didn't even exist when these alleged trade secrets were misappropriated." (D.I. 21 at 9–10.) Nor may SeeCubic have it both ways, disclaiming responsibility for the conduct of Stream and SCBV (D.I. 27 at 33 (Fourth Affirmative Defense); Ex. 5, APA § 5.6 (A0308)) while claiming the benefit of a limitations period that could only have begun with that conduct. Whether SeeCubic misappropriated Rembrandt's trade secrets is for trial; whether Rembrandt sued SeeCubic in time is not. Summary judgment should be entered on the Third Affirmative Defense and on so much of Count I as seeks a declaration that Rembrandt's claims are time-barred.

## IV. COUNTS II AND III FAIL AS A MATTER OF LAW

### A. Both Counts Require a Specific Expectancy, Wrongful Interference, Causation, and Damages

Tortious interference with prospective business relations requires "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages," all considered "in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." *Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001) (quoting *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981)). Interference with an existing contract likewise requires an intentional act, "without justification," that causes a breach. *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012). Either way, "the elements of that tort require some conduct that is wrongful or improper," *Cousins v. Goodier*, 283 A.3d 1140, 1163 (Del. 2022), judged by the factors in Restatement (Second) of Torts § 767, *WaveDivision*, 49 A.3d at 1174, and the plaintiff "bear[s] the burden of proof with respect to all elements of the claim of intentional interference, including that the interference was improper." *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1287 (Del. Super. Ct. 2001). Unfair competition likewise requires "a

reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes." *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057 (Del. Super. Ct. 2001); *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009). The Rule 12 ruling tested only the pleading; the question now is evidence.[2]

### B. There Is No Evidence of a Business Expectancy That Rembrandt Defeated

A claimant must "identif[y] a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant" and "cannot rely on generalized allegations of harm." *Agilent*, 2009 WL 119865, at *7 (internal quotation marks omitted); *see Lipson*, 790 A.2d at 1285–86 (a "mere 'perception'" of a relationship is not "a bona fide expectancy"). SeeCubic identifies none. It has never had a licensee or a customer for the technology and has "lost" none. (Ex. 1 at 70:1–18, 95:10–18, 104:7–10 (A0063, A0070, A0078).) The only "relationships" it names are its loans to and investments in Stream's Dutch subsidiaries—entities that never [redacted] whose parent had been in default since March 2020, and every one of which SeeCubic itself has owned since January 2025. (Ex. 1 at 18:13–17, 34:20–35:10, 227:15–228:5 (A0015, A0028–29, A0137–38); D.I. 143 ¶ 2.) A creditor's hope that an insolvent debtor will repay it is not a "reasonable probability of a business opportunity" with a third party, and SeeCubic offers no evidence that any of those entities would have paid anything, at any time, but for Rembrandt. The prospective Hyundai Mobis transaction

[2]Rembrandt's Answer to the Counterclaims pleaded that they fail to state a claim and reserved all other defenses. (D.I. 38 at 11.) To the extent justification or *Noerr-Pennington* immunity is treated as an affirmative defense, it may be raised on summary judgment where, as here, the opposing party is not prejudiced: the defenses arise from SeeCubic's own allegations, and discovery is complete. *Charpentier v. Godsil*, 937 F.2d 859, 863–64 (3d Cir. 1991); *Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 209 (3d Cir. 2001). Rembrandt will, if the Court prefers, move for leave to amend its Answer to add those defenses expressly.

on which the counterclaims dwell belonged to SCBV, not SeeCubic, and arose while SCBV belonged to Stream. (Ex. 11 ¶¶ 2.23–2.26 (A0373–74); D.I. 146 ¶ 8.)

### C. Nothing Rembrandt Did Was Wrongful

Each act on which the counterclaims rest is a lawful exercise of Rembrandt's own legal rights.

#### 1. Settling with Stream and licensing its technology.

"[T]here can be no improper interference where the defendant acted . . . affirmatively within its contractual rights." *Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *12 (Del. Ch. Sept. 22, 2016). One who, "by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means," causes another to enter into or forgo a transaction "does not interfere improperly." Restatement (Second) of Torts § 773 (1979); *Flores*, 2016 WL 5243950, at *12 & n.67. Rembrandt owned the technology, had sued Stream over it, and settled on the terms Mr. Stastney himself negotiated for Stream. SeeCubic's theory that Rembrandt "knew that Stream had no ability to perform" (D.I. 27 ¶ 46) is pleaded "upon information and belief" and has no evidentiary support: the Stream officer who documented the Agreement testified that Stream intended to perform and that there was no coordination with Rembrandt, and SeeCubic's CEO admitted he has no basis to say otherwise. (Ex. 2 at 105:2–14, 180:10–181:11, 183:4–18 (A0184, A0198–99, A0201); Ex. 1 at 47:17–23 (A0041).) Absent evidence that a representation was, "to the knowledge or belief of its utterer, . . . false," there is no "improper means," and a party "motivated at least in part by a desire to protect [its] investment" is justified as a matter of law. *WaveDivision*, 49 A.3d at 1174–75 (affirming summary judgment).

The same-day involuntary petition does not change the analysis. The Agreement made Rembrandt a creditor holding a liquidated claim for $1,528,000 due "immediately" (D.I. 1, Ex. 2

§ 15), and a creditor's resort to the Bankruptcy Code to collect what it is owed is petitioning activity, not an "improper means." *See* Part IV.C.2, *infra*. That the Delaware bankruptcy court later dismissed the petition shows only that it failed, not that it was baseless; a court must "resist the understandable temptation to engage in *post hoc* reasoning by concluding" that an ultimately unsuccessful "action must have been unreasonable or without foundation." *Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 n.5 (1993) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22 (1978)). And none of it was hidden: Rembrandt told SeeCubic's own counsel in April 2021 exactly what it was asserting. (D.I. 1 ¶ 89 & Ex. 21.)

**2. Petitioning the courts.**

The involuntary petition, Rembrandt's participation in Stream's bankruptcy, and this lawsuit are petitioning activity immune from tort liability under the *Noerr-Pennington* doctrine, which bars state-law claims for "tortious interference with contract, tortious interference with prospective economic advantage, and unfair competition" based on petitioning. *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128–29 (3d Cir. 1999); *Nuance Commc'ns, Inc. v. MModal LLC*, 2018 WL 6804488, at *2 (D. Del. Dec. 27, 2018) (immunity "extends to business torts"), *report and recommendation adopted*, 2019 WL 181322 (D. Del. Jan. 11, 2019). The "sham" exception requires litigation "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and "[t]he existence of probable cause to institute legal proceedings precludes a finding" of sham. *Prof'l Real Estate Invs.*, 508 U.S. at 60–62. This Court has already held Rembrandt's claims plausible (D.I. 26); Rembrandt's expert has traced Rembrandt's material into SeeCubic's code (Ex. 10 ¶¶ 247, 264 (A0361–62)); and SeeCubic acknowledged in the APA that the assets "may be subject to superior rights of Rembrandt." No reasonable juror could find

this suit objectively baseless, and SeeCubic's theory that Rembrandt interfered "by bringing this baseless lawsuit" (Ex. 4 at 16 (A0231)) fails as a matter of law.

### 3. Pre-suit assertions of Rembrandt's rights.

*Noerr-Pennington* immunity extends "to actions incidental to litigation, such as prelitigation letters." *Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, 2011 WL 678707, at *2 (D. Del. Feb. 18, 2011). The April 2021 emails were settlement communications from Rembrandt's counsel to Stream's counsel during Rembrandt's pending motion to enforce the term sheet (D.I. 1, Exs. 19–20), and the July and August 2023 emails to SCBV's director gave notice of the claims Rembrandt was then litigating in this Court. (D.I. 27, Ex. B; D.I. 26.) Independently, Delaware law does not treat a good-faith warning that a transaction would violate one's rights as wrongful. *Malpiede*, 780 A.2d at 1100 (defendant's "threat to enforce its rights . . . was lawful"); *Agilent*, 2009 WL 119865, at *8 (party that "believed its rights were infringed . . . was free to share that view with the marketplace"). SeeCubic identifies no false statement of fact in any of these communications; its quarrel is with the merits of Rembrandt's position, which this case will decide.

### 4. Declining to license SeeCubic.

Rembrandt's August 2023 covenant with Stream and VSI confirming that Rembrandt would not license SeeCubic or its principals (Ex. 9 § B (A0344)) is a refusal to deal, the prerogative of every property owner. "One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other . . . is not liable for that harm" absent a duty to deal or an illegal restraint of trade. Restatement (Second) of Torts § 762 (1979); *see Flores*, 2016 WL 5243950, at *12 (no improper interference "by omission where [the defendant] had no contractual obligation to deal"). An owner has no duty to license the party it accuses of

misappropriating its property. In any event the covenant cost SeeCubic nothing: SeeCubic "never asked for nor thought it needed" a license. (Ex. 1 at 66:17–67:10 (A0059–60).)

### D. There Is No Evidence of Proximate Causation or Damages

Delaware applies "but for" causation. *Flores*, 2016 WL 5243950, at *13. SeeCubic's asserted injury, the unpaid "$37 million," flowed from the insolvency of Stream's subsidiaries and Stream's own defaults, which predate every act complained of (Ex. 1 at 18:13–17, 227:15–228:5 (A0015, A0137–38)), and it has been overtaken by events: SeeCubic took control of SCBV in September 2023 and acquired SCBV, its sister companies, and their assets in January 2025. (D.I. 146 ¶¶ 10–11; Ex. 1 at 34:20–35:10 (A0028–29).) SeeCubic cannot recover from Rembrandt a debt owed by companies SeeCubic now owns. Nor can it attribute Mr. Berkenbosch's resignation to Rembrandt when he cited SeeCubic's own refusal to fund SCBV and Stream's objections in the same breath (Ex. 11 ¶ 2.26 (A0374)), and when the Dutch court then placed SCBV in Mr. Stastney's hands. (*Id.* ¶ 5.20 (A0381); D.I. 146 ¶ 10.)

That leaves attorneys' fees. "Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs." *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007). A litigant's expense in defending its adversary's claims is not compensable damage under a tort theory that treats the lawsuit itself as the wrong; otherwise every defendant could convert its fees into a counterclaim. *See Tatum v. Fairstead Affordable LLC*, 347 A.3d 1221, 1261–62 (Del. Ch. 2025) (American Rule "generally prevents a party from recovering fees and expenses as damages"). And SeeCubic never disclosed a computation of any category of damages, as Rule 26(a)(1)(A)(iii) requires (Ex. 7 § I.C (A0335)), and served no damages expert; it may not offer one now. Fed. R. Civ. P. 37(c)(1). Damages may not rest on "speculation or

conjecture." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) (internal quotation marks omitted).

### E. Count III Falls With Count II

Unfair competition requires the same "reasonable expectancy" and "wrongful[] interfere[nce]" as Count II. *Total Care Physicians*, 798 A.2d at 1057. Where "no evidence in the record . . . supports the notion that [the defendant] 'wrongfully interfered' with [the plaintiff's] expected business relationships," summary judgment follows. *Id.* at 1057–58. Rembrandt and SeeCubic do not even compete for customers: Rembrandt owns the technology SeeCubic is using, and the only "unfair action" alleged is Rembrandt's insistence on being paid for it.

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment for Rembrandt on SeeCubic's Third and Seventh Affirmative Defenses, on Count I of SeeCubic's Counterclaims insofar as it seeks a declaration that Rembrandt's claims are time-barred, and on Counterclaim Counts II and III.

Dated: September 18, 2026

AMBURN LAW
/s/ Dean W. Amburn
Dean W. Amburn (#7295)
David H. Holloway (#5762)
1504 N. Broom Street, Suite 1
Wilmington, DE 19806
(302) 285-9485
dwa@amburnlaw.com
dholloway@amburnlaw.com
*Attorneys for Plaintiff*
*Rembrandt 3D Holding Ltd.*